SAN MIGUEL & COMPAÑÍA, INC., querellante y apelante, v.
SECRETARIO DE HACIENDA, demandado y apelado.

Número 11150.

*Sometido:* 9 de noviembre de 1954. *Resuelto:* 31 de mayo de 1956.

*Fernando Fornaris, Jr.* y *Jorge Luis Rivera,* abogados de la apelante; *Hon. Secretario de Justicia José Trías Monge* y *Manuel J. Medina Aymat, Procurador Auxiliar,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR BELAVAL emitió la opinión del Tribunal.

En sus declaraciones de ingresos correspondientes a los años contributivos terminados en 31 de agosto de 1943 y en 31 de agosto de 1944, la querellante dedujo de su ingreso

contributivo, como cuentas incobrables, dos partidas ascendentes a $15,000 y $36,402.90, de la cuenta que adeudaba a la querellante, la Compañía de Cerámicas de Puerto Rico, Inc. Durante el año contributivo terminado en 31 de agosto de 1945, la querellante recibió el pago de la totalidad de la cuenta y lo declaró como ingreso correspondiente al año contributivo terminado en 31 de agosto de 1945. El anterior Tesorero de Puerto Rico rechazó, tanto la exclusión de dichas dos partidas, consideradas incobrables por la contribuyente, como la inclusión de las mismas en el ingreso declarado en el año 1945.

En las mismas declaraciones de ingresos correspondientes a los años contributivos terminados en 31 de agosto de 1944 y en 31 de agosto de 1945, la querellante dedujo de su ingreso contributivo, como cuentas incobrables, dos partidas ascendentes a $50,000 y $135,279.78 de la cuenta que adeudaba a la querellante la San Juan Construction Corporation, que fueron también rechazadas por el anterior Tesorero de Puerto Rico.

No habiendo obtenido remedio en la correspondiente vista administrativa, la contribuyente acudió al Tribunal Superior de Puerto Rico, Sala de San Juan, y esta Sala, por voz de su ilustrado Juez, señor Carlos Santana Becerra, confirmó la actuación del anterior Tesorero de Puerto Rico. En cuanto a las dos partidas correspondientes a la cuenta de la Compañía de Cerámicas de Puerto Rico, Inc., la ilustrada Sala sentenciadora llegó a la conclusión, que mejor que una cuenta incobrable de la querellante como entidad mercantil, se trataba de una pérdida de la querellante, como accionista, pues el análisis del activo de la Compañía liquidada, demostraba que existió siempre suficiente activo fijo, compuesto de edificios, equipo y maquinaria, para haber pagado dicha deuda, aunque tal vez no fuera suficiente para pagar también el capital suscrito por la querellante, la cual resultaba ser, además de acreedora, la principal accionista; que el desglose en dos distintos años de la cuenta fué una

actuación arbitraria de los oficiales de la corporación quere-
llante, y no obedeció a ninguna determinación razonable de
las circunstancias que hacían dicha cuenta incobrable.

En cuanto a las dos partidas correspondientes a la cuenta
de la San Juan Construction Corporation la ilustrada Sala
sentenciadora concluyó que se trataba de dos cuentas de re-
servas, abiertas sin autorización del anterior Tesorero, para
afrontar un pasivo eventual, y que las entradas que en las
mismas se hicieron determinaron pérdidas anticipadas por
transacciones no terminadas a la fecha de la deducción.

Con relación al primer aspecto de la cuestión litigiosa,
referente a las partidas de la Compañía de Cerámicas de
Puerto Rico, Inc., la prueba sobre la cual basó la ilustrada
Sala sentenciadora sus conclusiones de hecho y sus conclu-
siones mixtas de hecho y de derecho, demostró, que la Com-
pañía de Cerámicas de Puerto Rico, Inc., se inició en el 1940,
con una planta industrial situada en Hato Rey, en la cual
se invirtió alrededor de $100,000; que de un total grueso
de 1278.50 acciones, la querellante San Miguel & Cía., Inc.,
poseía 314.6572 acciones y don Marcelino San Miguel poseía
105.1786 acciones; que hay 250 acciones que poseía Sucrs.
de San Miguel Hermanos, S. en C., aunque no consta quiénes
eran los dueños de dicha mercantil; que don Marcelino San
Miguel era el presidente de la Compañía de Cerámicas de
Puerto Rico, Inc., y vicepresidente y Gerente General de la
querellante San Miguel & Cía., Inc.; que en el 1941 un in-
cendio destruyó totalmente el edificio y prácticamente toda
la maquinaria y que el seguro no pasaba de $10,000; que
mediante una nueva aportación de capital, se instaló nueva-
mente la fábrica en un edificio de Bayamón y se recons-
truyó la maquinaria; que desde el 1941 hasta el 1943 la
Compañía estuvo en un período más de experimentación que
de explotación; *que en el 1943 ya se pensaba cerrar la fá-
brica*, pero vino el señor Moscoso de la Compañía de Fo-
mento y le informó a los oficiales de la Compañía, que el
Gobierno de Puerto Rico estaba interesado en desarrollar la

industria de cerámica en Puerto Rico y quería unirse a ellos con el objeto de realizar unos nuevos experimentos; que a tal fin les dieron algún dinero y les facilitaron un técnico; *que en el año 1944, allá por julio o agosto,* la Compañía de Fomento les informó que el Gobierno de Puerto Rico había decidido comprar el negocio "porque el Gobierno tenía mucho dinero para invertir en una cosa grande y nueva y querían hacer una industria grande"; que allá hacia octubre o noviembre de 1944 se convino en venderlo todo por $60,000; que al 31 de mayo de 1943, el activo fijo de la Compañía de Cerámicas de Puerto Rico, Inc., ascendía a $112,316.65 y la cuenta de la Compañía de Cerámicas de Puerto Rico, Inc., con la corporación querellante San Miguel & Cía., Inc., al 31 de agosto de 1943, ascendía a $51,402.90; que al 31 de mayo de 1944, el activo fijo de la Compañía de Cerámicas de Puerto Rico, Inc., ascendía a $102,337.02 y la cuenta de la Compañía de Cerámicas de Puerto Rico, Inc., con la corporación querellante San Miguel & Cía., Inc., al 26 de agosto de 1944, ascendía a $38,921.10; que en 31 de mayo de 1945, las dos partidas determinadas como incobrables, la de $15,000 y la de $36,402.90, ascendentes a $51,402.90, les fueron pagadas a la querellante por la Compañía de Cerámicas de Puerto Rico, Inc.

Con relación al segundo aspecto de la cuestión litigiosa, referente a las partidas de la San Juan Construction Corporation, la prueba sobre la cual basó la ilustrada Sala sentenciadora sus conclusiones de hecho y sus conclusiones mixtas de hecho y de derecho, demostró, que la corporación San Juan Construction Corporation se había organizado con $2,000 de capital; que las obligaciones que la San Juan Corporation tenía con la querellante, eran de tres clases: (1) una cuenta corriente de materiales, primas de seguros y otros servicios suplidos a la construcción de tres obras públicas; (2) unos pagarés de la San Juan Construction Corporation garantizados solidariamente por la querellante; (3) una garantía otorgada por la querellante a la com-

pañía, que a su vez, garantizaba la ejecución de las obras públicas (*performance bonds*) que estaba realizando la San Juan Construction Corporation; que el 31 de agosto de 1944, la querellante abrió en sus libros una cuenta de reserva de $50,000 para los siguientes fines:

"reserva que se crea específicamente para responder a probables pérdidas en la cuenta, garantías y demás de la corporación San Juan Construction Corp., según hemos podido justificar al examinar las condiciones financieras de dicha corporación y las pérdidas que tendrá la misma en la terminación de los contratos de construcción que a la fecha está llevando a cabo."

que al 31 de agosto de 1944, la cuenta de materiales, primas de seguros y otros servicios, ascendía a $28,427.20 y las obligaciones garantizadas al Chase National City Bank ascendían a $159,228.34; que la querellante en su declaración de ingresos correspondiente al año contributivo terminado en 31 de agosto de 1944 dedujo de su ingreso tributable la totalidad de la reserva abierta para enjugar la posible pérdida de la San Juan Construction Corporation; que el 31 de agosto de 1945 la querellante abrió en sus libros una ampliación de la cuenta de reserva anterior por $150,000 adicionales, para los siguientes fines:

"aumentamos la reserva creada en 8/31/44 específicamente para responder a probables pérdidas en la cuenta, garantías prestadas y demás de la corporación San Juan Construction Corp., según hemos podido justificar al examinar las condiciones financieras de dicha corporación y las pérdidas estimadas en el resultado de operaciones hasta la fecha de la misma en la terminación de los contratos de construcción que a la fecha está llevando a cabo."

que al 31 de agosto de 1945, la cuenta de materiales, primas de seguros y otros servicios ascendía a $160,471.75 y las obligaciones garantizadas al Chase National City Bank ascendían a $213,736.47; que la querellante en su declaración de ingresos correspondientes al año contributivo terminado en 31 de agosto de 1944 dedujo de su ingreso bruto la can-

tidad de $135,279.78 de la reserva abierta para enjugar la posible ampliación de pérdida de la San Juan Construction Corporation.

La ley aplicable al caso es la sec. 32(*a*)(5) de la Ley núm. 74 de 6 de agosto de 1925, según enmendada por la Ley núm. 31 de 12 de abril de 1941,—13 L.P.R.A. 583, sec. 735—que dispone: "(*a*) al computar el ingreso neto de una corporación o sociedad sujeta a la contribución impuesta por la sec. 731 de este título, se admitirán como deducciones... (5) débitos que se hayan juzgado incobrables *y que hayan sido eliminados dentro del año contributivo,* (o a discreción del Secretario de Hacienda una suma razonable como reserva para cuentas malas); cuando se convenza que una deuda puede ser cobrable solamente en parte, el Secretario de Hacienda puede permitir que dicha deuda sea en parte eliminada" y los arts. 123 y 127 del Reglamento núm. 1 de la Ley de Contribuciones sobre Ingresos de 1924.

Las disposiciones, tanto de la ley como del Reglamento, le permiten a un contribuyente la deducción de cuentas incobrables por medio de un cargo directo o por medio del establecimiento de una cuenta de reserva, autorizada por el Secretario de Hacienda. Cuando el contribuyente ha elegido uno de los dos métodos autorizados para la deducción de sus cuentas incobrables, no puede cambiar al otro, sin consentimiento del Secretario de Hacienda.

Si el contribuyente usa el método de cargo directo, antes de proceder a contabilizar en sus libros dicho cargo, como incobrable, debe analizar todas las circunstancias en torno a dicha cuenta, para determinar, con razonable certeza, que se trata de una cuenta realmente incobrable, en todo o en parte, tomando siempre en consideración la verdadera situación financiera de su deudor, y en los casos apropiados, el valor de cualquiera garantía que exista para el pago de la cuenta. También debe cerciorarse si la misma no es susceptible de cobro compulsorio por la vía legal. Por su parte, el Secretario de Hacienda tiene derecho a investigar, si en

realidad, atendidas todas las circunstancias que rodean la cuenta, la misma resulta realmente incobrable.

Si el contribuyente decide cambiar el método de cargo directo por el método de establecer una reserva para cuentas incobrables, después de estar debidamente autorizado por el Secretario de Hacienda para tal cambio, deberá determinar el montante de la reserva de acuerdo con lo que dicha reserva debe ser al finalizar el año contributivo anterior. De acuerdo con el art. 123 del Reglamento, el montante de dicha reserva no podrá ser deducido al computar el ingreso neto de dicho año contributivo anterior, pero las deudas incobrables, anteriores al año contributivo en que el cambio de método tuvo efecto, podrán ser cargadas contra la reserva, y deducidas del ingreso correspondiente al año en que sean cargadas, como si se tratara de un cargo directo. Para el año contributivo en curso a la fecha en que se hizo el cambio y años subsiguientes, el contribuyente podrá añadir una suma razonable a la reserva fijada para los años contributivos anteriores, y las cuentas incobrables, posteriores al establecimiento de la reserva, deberán ser cargadas contra la reserva según ampliada, pero no podrán ser deducidas del ingreso, puesto que ya la totalidad de la ampliación de reserva está deducida. La misma regla prevalece para la determinación de incobrabilidad cuando se trate de una reserva: el contribuyente debe analizar todas las circunstancias en torno a dicha cuenta, la situación financiera de su deudor, el valor de las garantías prestadas y su posibilidad de ser recobrada por la vía legal, antes de cargarla contra la cuenta de reserva.

Como regla general se puede establecer que, el contribuyente tiene la primera oportunidad en determinar si una cuenta es realmente incobrable. Pero esta determinación no es indisputable, y el Secretario de Hacienda tiene la segunda oportunidad de determinar su incobrabilidad. Si atendidas todas las circunstancias que rodean a dicha cuenta, la misma resulta incobrable, la determinación ini-

cial del contribuyente debe ser respetada. Si por el contrario, el contribuyente no ha cumplido con la diligencia propia al buen comerciante, el Secretario de Hacienda tiene derecho a denegar la deducción, lo mismo cuando se trata de un cargo directo que cuando se trata de una cuenta de reserva.

En toda deducción de cuenta incobrable, hay tres indagaciones que debemos realizar, a los fines de dejar cumplida nuestra función judicial: (1) si se trata de una cuenta, propiamente dicha, tal como la entiende el derecho contributivo; (2) si atendidas todas las circunstancias en torno a la cuenta, la misma resulta realmente incobrable; (3) si la cuenta resulta incobrable, a qué año contributivo corresponde justamente su deducción.

En derecho contributivo, para que una deuda resulte deducible como deuda incobrable, debe tener las siguientes características: (1) la relación entre el deudor y el contribuyente debe ser una relación de deudor y acreedor; (2) la probabilidad de cobrar la deuda debe existir desde que la misma se contrae; *W. F. Young, Inc.* v. *Commissioner of Internal Revenue*, 120 F.2d 159 (*Mahoney*), (1941), cita precisa a la pág. 166; (3) la obligación del deudor de pagar la deuda no debe estar sujeta a ninguna contingencia futura; (4) la cuenta debe ser exigible inmediatamente; (5) la pérdida que la imposibilidad del cobro ocasione debe sufrirla directamente el acreedor-contribuyente (*run to the taxpayer*), 5 Mertens—*Law of Federal Income Taxation* 400–406, sec. 30.03 (ed. de Callagham & Company de 1953). Esto excluye todas las obligaciones voluntariamente pagadas o asumidas por el acreedor-contribuyente.

Después que la indagación judicial se encuentra satisfecha, que en realidad de verdad, se trata de una *deuda* y no de una obligación voluntariamente asumida a nombre de otro, o de una donación, o de una extensión de crédito para otros fines que no sean para establecer la relación de deudor-acreedor requerida, el carácter de la incobrabilidad

hay que establecerlo mediante la consideración de todas las circunstancias que hacen dicho débito incobrable, total o parcialmente, tales como, la insuficiencia económica del deudor para realizar el pago, la insuficiencia de la garantía prestada para responder al cumplimiento de la deuda, si la hubiera, y la inutilidad de cualquiera gestión de cobro compulsorio, por la vía legal.

Pero no basta concluir que se trata de una deuda, y que la misma resulta incobrable; además hay que determinar a qué año contributivo pertenece la deducción del débito incobrable. El artículo 123 del Reglamento núm 1 de nuestra Ley de Contribuciones sobre Ingresos de 1924 dispone que: "cuando todas las circunstancias alrededor de la misma, y que deban ser atendidas, indique, que una deuda no tiene valor (*worthless*), bien sea en todo o en parte, la cantidad que resulte sin valor y que haya sido contabilizada (*charged-off*) o reducida a una cuenta nominal en los libros del contribuyente, podrá ser permitida como una deducción al computar el ingreso neto. Debe acompañar a la planilla de ingresos, una declaración explicativa de la pertinencia de cualquiera deducción reclamada por concepto de cuenta incobrable. No se concederá deducción alguna por aquella parte de una deuda estimada como sin valor y contabilizada antes del 1ro. de enero 1921, a menos que y hasta que, la deuda de la cual forma parte, sea estimada en su totalidad como una deuda sin valor, definitivamente contabilizada como tal o reducida a una cuenta nominal, o la pérdida que la misma implica, determinada, en cualquiera otra manera, como una transacción debidamente terminada y cerrada (*closed and completed transaction*). Antes que un contribuyente pueda contabilizar y deducir parcialmente una cuenta incobrable tiene que estimar y estar preparado a demostrar, con un razonable grado de certeza, la parte de la misma que resulte incobrable."

De acuerdo con el estado de derecho prevaleciente en Puerto Rico, bajo las disposiciones de la Ley núm. 74

de 6 de agosto de 1925 de Contribuciones sobre Ingresos, idéntico al que prevalecía antes del 1942 en la legislación federal de rentas, la deducción de cuentas incobrables está sujeta a dos conclusiones: (1) la determinación de incobrabilidad atendidas todas las circunstancias que ya hemos examinado y (2) la contabilización en los libros del contribuyente dentro del mismo año en que se determine la incobrabilidad, de la parte o la totalidad de la cuenta, determinada como incobrable, mediante un cargo directo, si ese es el método que utiliza el contribuyente, o mediante un cargo en la cuenta de reserva, si dicho contribuyente utiliza el método de la cuenta de reserva: 5 Mertens'—*Law of Federal Income Taxation* 397, sec. 30.01, final del escolio 7. Como toda cuenta incobrable presume una pérdida—5 Mertens' 416, sec. 30.14 (obra y edición citadas); *Barquet Hnos.* v. *Tesorero,* 39 D.P.R. 705,(*Wolf*) (1929), cita precisa pág. 707; *D. Velasco & Co.* v. *Sancho Bonet, Tesorero,* 51 D.P.R. 56, (*Córdova Dávila*) (1937), cita precisa pág. 60; *Squier* v. *Commissioner of Internal Revenue,* 68 F.2d 25,(*Hand*) (1933), cita precisa pág. 26, *Austin* v. *Helvering,* 77 F.2d 373, (*Martin*) (1935), cita precisa pág. 374; *United States* v. *Burrows Bros. Co.,* 133 F.2d 772, (*Martin*) (1943), cita precisa págs. 774 y 775; la regla general, que puede establecerse es, que la deducción por una cuenta incobrable pertenece a aquel año contributivo en que desaparece por completo la posibilidad del recobro total o parcial de la misma: 5 Mertens' 315–317, sec. 28.71 (obra y ed. citadas), correspondiendo al contribuyente el peso de la prueba: 5 Mertens' 499, sec. 30.82 (obra y ed. citadas), *Greer-Robbins Co.* v. *Commissioner of Internal Revenue,* 119 F.2d 92, (*Denman*) (1941), cita precisa pág. 93. Meras conclusiones generales del contribuyente sobre la incobrabilidad no son suficientes para cumplir con el peso de la prueba: 5 Mertens' 440, sec. 30.29 (obra y ed. citadas), *Reading Co.* v. *Commissioner of Internal Revenue,* 132 F.2d 306, (*Jones*) (1942), cita precisa pág. 309.

De acuerdo con nuestro propio Reglamento hay que determinar además si se trata de una operación debidamente terminada y cerrada (*closed transaction*), en el año en que se solicita la deducción total o parcial.

 En este caso la contribuyente había adoptado el método de cargo directo, y sin autorización del anterior Tesorero de Puerto Rico, cambió al método de la cuenta de reserva. El resultado es que toda contabilización de la cuenta de reserva, tanto en su montante inicial como en su ampliación posterior, resulta nula y sigue prevaleciendo el método del cargo directo—5 Mertens' 499, sec. 30.81 (obra y ed. citadas). Aunque no hay constancia directa en la prueba del sistema de contabilidad utilizado por la contribuyente, tomamos nota de la afirmación contenida en el alegato del Secretario de Hacienda, en el sentido, que el sistema de contabilidad utilizado por la contribuyente, es uno de incurrido y devengado. Utilizando la analogía de la "pérdida", podríamos decir, como afirma Mertens, que independientemente del sistema de contabilidad utilizado por el contribuyente, "el punto fundamental es, si ha habido una transacción cerrada (*closed transaction*) y si la posibilidad del reembolso o recobro, en un mecanismo u otro, ha desaparecido." 5 Mertens' 315–316, sec. 28.71 (obra y ed. citadas).

Habiendo expuesto la teoría general sobre la deducibilidad de las cuentas incobrables, examinemos ahora el señalamiento de errores presentados en esta apelación. Con relación a la cuenta de la Compañía de Cerámicas de Puerto Rico, Inc., la querellante pide remedio contra los siguientes pronunciamientos erróneos de la ilustrada Sala sentenciadora: (1) que la Compañía de Cerámicas de Puerto Rico, Inc., era una subsidiaria de la querellante San Miguel & Cía., Inc.; (2) que las deducciones de $15,000 en el año 1943 y de $36,402.90 en el año 1944, carecieron de base razonable o racional y obedecieron exclusivamente a la caprichosa determinación del señor Marcelino San Miguel, presidente de

la Compañía de Cerámicas de Puerto Rico, Inc., y vicepresidente y gerente general de San Miguel & Cía., Inc.; (3) que por no exceder el pasivo de la corporación deudora, al activo de dicha corporación durante los años en que la apelante hizo sus deducciones, el análisis de dicho pasivo no constituía una base legal o racional o evento o hecho evidenciario suficiente para autorizar a ésta a deducir las partidas en controversia al computar su ingreso neto en dichos años.

Es de notarse que la ilustrada Sala sentenciadora no concluye, como cuestión de hecho, que la Compañía de Cerámicas de Puerto Rico, Inc., fuera una subsidiaria de la querellante San Miguel & Cía., Inc. Es en sus conclusiones de derecho que hace referencia al posible control de una corporación por la otra. Asumiendo, aunque sin resolverlo, que la evidencia que tuvo ante sí la ilustrada Sala sentenciadora, no resultara suficiente para determinar el control corporativo de la corporación deudora por la corporación acreedora (*stock-owned subsidiary*), no cabe la menor duda, que al pasar sobre la inhabilidad de la contribuyente de cobrar la cuenta de la compañía, la ilustrada Sala sentenciadora pudo haber considerado el hecho que la propia acreedora fuera la principal accionista de la corporación deudora, que el vicepresidente y gerente general de la corporación acreedora resultara ser el presidente de la corporación deudora. No podemos, pues, utilizar como fundamento para la revocación, alguna expresión más o menos inconexa, con la verdadera doctrina aplicada en la solución del problema.

La explicación que da el único testigo de la demandante, el señor Marcelino San Miguel, sobre el desglose de la cuenta incobrable de la Compañía de Cerámicas de Puerto Rico, Inc., en dos años contributivos distintos, no es satisfactoria. El señor San Miguel declara que después de tomar en cuenta todos los factores, recomendó "matar" la cuenta en la forma que se hizo. Se trata, pues, de una mera

conclusión que, según hemos visto, no es suficiente para que la responsabilidad que tiene el contribuyente de probar las circunstancias que justifican la deducción, parcial o total, quede cumplida. Por el análisis de la prueba que tuvo ante sí la ilustrada Sala sentenciadora, a la cual le dió crédito, resulta que en el 1943, que es el año de la primera deducción de $15,000, había suficiente activo fijo, para haber pagado dicha cuenta si se pensaba cerrar la fábrica; en ese mismo año 1943, la Compañía de Fomento había aportado nuevo capital y consejo técnico. En el 1944, que es el año de la segunda deducción de $36,402.90, ya la Compañía de Fomento le había comunicado a los directores de la corporación su interés de comprar la fábrica, antes de haber finalizado el año contributivo; en octubre o noviembre de 1944 la venta a la Compañía de Fomento se había consumado. En mayo 31, 1945, o sea seis meses después, la cantidad total de la cuenta había sido reintegrada (exhibit 4 de ambas partes). Dentro de esta situación es muy difícil considerar la transacción envuelta como una transacción cerrada, sujeta a un reembolso fortuito. No es de extrañarse que la ilustrada Sala sentenciadora, no considerara como suficiente, la razón aducida para la determinación de la incobrabilidad.

■ La prueba demuestra que en el estado de activo y pasivo de la Compañía de Cerámicas de Puerto Rico, Inc., al 31 de mayo de 1943, el activo corriente, fijo y por otros conceptos ascendía a $177,224.78, y el pasivo, sin la cuenta capital, ascendía a $146,686.67; que en el estado de activo y pasivo de la misma corporación al 31 de mayo de 1944, el activo corriente, fijo y por otros conceptos ascendía a $166,079.78. Durante estos dos años el verdadero déficit de la corporación era la cuenta de capital suscrito y pagado. El análisis aislado del activo fijo, consistente en edificios, maquinarias y otros bienes tangibles, demuestra, que al 31 de mayo de 1943, el activo fijo de la corporación deudora era de $112,316.65 y al 31 de agosto de 1943 la deuda de la corporación deudora con la contribuyente-acreedora era de

$51,402.90; al 31 de mayo de 1944, el activo fijo de la corporación deudora era de $102,337.02 (reducción por depreciación), y al 31 de agosto de 1944 la deuda de la corporación deudora con la contribuyente-acreedora era de $39,921.10. Aunque, tal vez, dentro de la puridad matemática no se pueda concluir que en los años 1943 y 1944 la querellante tenía más activo que pasivo, la interpretación práctica de los hechos que siempre guían el buen juicio judicial, en cuestiones litigiosas relacionadas con el derecho contributivo, permite el análisis aislado de determinadas partidas, con el fin de determinar la verdadera responsabilidad económica de la corporación, a los efectos de concluir sobre la condición de incobrable de sus cuentas deudoras. La conclusión marginal de la ilustrada Sala sentenciadora en el sentido que mejor que ante una cuenta incobrable, estaba frente a una posible pérdida de capital, está sostenida por la prueba.

▉ Con relación a las cuentas de la San Juan Construction Corporation, la querellante pide remedio contra los siguientes pronunciamientos erróneos de la ilustrada Sala sentenciadora: (1) decidir que la deducción de $50,000 en el 1944 y la deducción de $135,279.78 en el 1945, no fueron eliminadas de sus libros como cuentas incobrables; (2) decidir que la querellante y apelante "creó como cosa aparte, y con las aludidas sumas de $50,000 y $135,279.78, ciertas reservas que no eran reservas para débitos malos, sino reservas para afrontar un pasivo eventual cubriendo posibles pérdidas por anticipado en relación con transacciones no terminadas a la fecha de la deducción"; (3) decidir que los balances o saldos deudores en cuenta corriente de San Juan Construction Corporation para con la demandante-apelante al 31 de agosto de 1944 y 1945, no eran para dichas fechas débitos malos o cuentas incobrables deducibles al computar el ingreso neto de la apelante.

Del exhibit conjunto número 8 que representa las cuentas de la San Juan Construction Corporation con la quere-

llante y apelante en este caso, no aparece que dichas partidas fueran contabilizadas (*charged-off*) en las cuentas, como porción declarada incobrable. Explicando esta situación el señor Marcelino San Miguel, único testigo de la querellante, declaró: "ésta es la hoja de la cuenta corriente de la máquina de contabilidad. Esto tiene varias copias, salen varias copias, y al fin de mes una de esas copias se manda a los clientes. La política es que cuando a un cliente se le rebaja una cantidad de una deuda que se considera perdida, de su cuenta no se le manda ninguna nota diciéndole que se considera perdida parte de su cuenta, sino que la consideramos rebajada de ahí." (T. de E. 65.) Sin embargo, en las cuentas de la Compañía de Cerámicas de Puerto Rico, Inc., las deducciones de las cantidades consideradas como incobrables, aparecen contabilizadas, aunque se trata del mismo sistema de contabilidad descrito por el declarante. El testigo, confrontado con esta situación, explica que la contabilización de las partidas de la Compañía de Cerámicas de Puerto Rico, Inc., se debió a "que esta compañía ya se había pensado en liquidarla antes y ya era un hecho conocido de los accionistas de que era una pérdida total. Estaba más que justificada la rebaja." (T. de E. 65.)

La ilustrada Sala sentenciadora tuvo ante sí dos versiones contradictorias sobre la contabilización de dos distintos juegos de partidas por un mismo concepto, y optó por descartar la versión oral de la prueba de la querellante y atenerse a los contenidos de la prueba documental de la misma parte. Examinada la hoja de cuenta corriente es difícil concebirla como una factura, en el sentido ordinario de las cosas. No podemos, pues, considerar como claramente errónea, la conclusión de hecho correspondiente.

▇▇▇▇ No hay duda, que la cuenta de reserva original y la ampliación posterior de la reserva fueron abiertas para responder a *probables pérdidas* en la cuenta, garantías y demás responsabilidades de la corporación San Juan Construction Corporation en la terminación de los contratos,

que a la fecha en que se abrió la cuenta de reserva, estaban llevándose a cabo. Como no se solicitó permiso del anterior Tesorero de Puerto Rico para abrir dichas reservas, tenemos que determinar su eficacia, como si se tratara de un cargo directo de cuenta incobrable. Sabido es que en los contratos de obras públicas el pago se va efectuando, según se va certificando por los inspectores de las obras, la terminación de determinadas unidades de la construcción. Esto implica que no hay posible forma de determinar cualquier montante incobrable hasta que se pruebe qué porción de la obra ha sido realizada hasta la fecha y qué parte del precio se ha recibido. En los detalles de las cuentas de materiales correspondientes al acueducto de Trujillo y al alcantarillado de la calle de Loíza, que parecen ser, las dos únicas obras de las tres terminadas al 31 de agosto de 1945, las dos partidas dadas de baja son de $16.80 y de $527.97, respectivamente. Lo otro son obligaciones firmadas por la contribuyente a un banco como garantía solidaria con otras personas para obtener dinero para esas mismas obras y una garantía prestada por la contribuyente a una compañía de fianzas para asegurar la ejecución de las obras (*performance bond*), que indudablemente, al 31 de agosto de 1944 y al 31 de agosto de 1945, no había forma de determinar su montante, puesto que la obra principal estaba en proceso de construcción.

Las razones por las cuales, la contribuyente alega, tuvo que anticipar la determinación de incobrabilidad, son poco convincentes. El señor San Miguel declaró: "Yo no podía dejarlo para lo último . . . entiendo que si se hubiese dejado para lo último, el Tesorero ha podido decirnos: señor, como usted dejó para lo último una pérdida de doscientos mil y pico de dólares, cuando ya la contabilidad demostró que año tras año ha venido arrastrando pérdidas." (T. de E. 73.) Más tarde dice que en agosto 31 de 1945 se "mató" solamente parte de la deuda, $135,279.78 y no los $150,000 de la ampliación de la reserva "para no poner números rojos

en los libros." (T. de E. 76.) Considerando esta cuenta de reserva y su posterior ampliación como cargos directos, que es en la única forma como podemos considerarla, es indudable que no se trataba de una transacción cerrada, donde el montante parcial o total de la parte realmente incobrable estaba ya determinada, y que la conclusión de la ilustrada Sala sentenciadora, en el sentido, que antes que una cuenta incobrable se trataba de un pasivo eventual cubriendo posibles pérdidas por anticipado en relación con transacciones no terminadas a la fecha de la deducción, no resulta claramente errónea.

 Ahora bien, la deuda de la San Juan Construction Corporation para con la querellante, ¿podía considerarse como una "deuda" en el sentido que dicho término tiene en derecho contributivo? Se trata de una corporación con $2,000 de capital a la cual la querellante extiende un crédito para materiales de construcción que al 31 de agosto de 1944 asciende a $28,427.20, al 31 de agosto de 1945 asciende a $160,471.75 y al 31 de agosto de 1946 asciende a $248,670.56. Además, la querellante había garantizado, solidariamente con otras personas, las deudas de dicha corporación deudora con el Chase National Bank hasta la suma de $605,000. Todavía más, la querellante resultaba garantizadora a una compañía de fianzas, que a su vez, garantizaba la ejecución de las obras públicas, por un montante indeterminado.

La ilustrada Sala sentenciadora se negó a reconocer la relación de deudor-acreedor que debe existir en una deuda incobrable, por entender que la corporación deudora no era otra cosa que un mero instrumento utilizado por la querellante para dedicarse ella directamente a la construcción de obras públicas. El propio testigo de la querellante declara que, para los años 1943, 1944 y 1945, el negocio de materiales de construcción estaba sometido a muchísimas restricciones de emergencia, que "no se podían hacer construcciones ni reparaciones, todo estaba controlado por una oficina federal que estaba aquí", *no se le podía vender nada a una*

*persona* sin una autorización especial . . . "no se podía vender nada si no era con prioridad . . . eso trajo una profunda preocupación por que, en primer lugar, *no se podía comprar nada*, si no era con prioridades y entonces esas prioridades había que buscarlas." (T. de E. 36–37.) Aunque esta línea de pensamiento queda sin ulterior desarrollo en la prueba, si se une a la elocuente prueba de las tres cuentas, no se puede considerar que la conclusión de la ilustrada Sala sentenciadora fuera claramente errónea.

Es indudable, asimismo, que la probabilidad de cobrar la deuda al tiempo en que ésta se contrae, otro elemento característico de la deuda incobrable, según hemos visto, era bastante remota. La explicación que da el único testigo de la querellante a esta extensión de crédito tan desproporcionada con la capacidad económica de la deudora, es que como ya tenían más "que un pie metido en el bote", tenían que seguir adelante, dando la impresión que más que para la reventa y el lucro que persigue la operación mercantil ordinaria, la extensión de crédito se hacía para reducir la posible pérdida de la contribuyente en otras obligaciones.

Aunque la extensión posterior de crédito no es invariablemente adversa al análisis de la incobrabilidad, la misma tiene que demostrar, que ante todo, se hace para salvar la deuda misma que se determina incobrable, y no otras obligaciones que puedan existir entre la acreedora y la deudora. Si las circunstancias resultan las segundas, la extensión posterior de crédito contradice la alegada incobrabilidad: 5 Mertens' 444–445, sec. 30.33 (obra y edición citadas).

Si la obligación de pagar la deuda está sujeta a una contingencia futura, aunque se trate de un sistema de incurrido y devengado, la contribuyente no puede deducir la deuda, puesto que la consideración final de incobrabilidad no puede determinarse dentro del año contributivo en que se solicita la deducción: *Bravo* v. *Tesorero*, 76 D.P.R. 154 (*Pérez Pimentel*), (1954), cita precisa a la página 157, escolio 2; *Cía. Marítima, etc.* v. *Descartes*, 78 D.P.R. 589 (*Belaval*).

(1955), cita precisa a la página 596. La contribuyente ha debido esperar hasta la liquidación final de los tres contratos de obras públicas para determinar finalmente la incobrabilidad de la cuenta deducida.

*Por las razones expuestas, se confirma la sentencia.*

El Juez Asociado Sr. Saldaña no intervino.