SAN MIGUEL & COMPAÑÍA, INC., Petitioner and Appellant, *v.* SECRETARY OF THE TREASURY, Respondent and Appellee.

No. 11150. Argued November 9, 1954.—Decided May 31, 1956.

---

328

*Fernando Fornaris, Jr.* and *Jorge Luis Rivera* for appellant. *José Trías Monge, Attorney General,* and *Manuel J. Medina Aymat, Assistant Attorney General,* for appellee.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

In its income tax returns for the tax years ending on August 31, 1943, and on August 31, 1944, the petitioner deducted from its taxable income tax, as bad debts, two items amounting to $15,000 and $36,402.90, of the account owed to the petitioner by the Compañía de Cerámicas de Puerto Rico, Inc. During the tax year ending on August 31, 1945, the petitioner received the entire balance of the account and declared it as income corresponding to the tax year ending August 31, 1945. The former Treasurer of Puerto Rico disallowed the exclusion of those two items, considered as bad accounts by the taxpayer, as well as their inclusion in the income reported in the year 1945.

In the same income tax returns for the tax years ending August 31, 1944, and August 31, 1945, the petitioner deducted from its taxable income, as bad debts, two items amounting to $50,000 and $135,279.78 of the account that the San Juan Construction Corporation owed petitioner, which were also disallowed by the former Treasurer of Puerto Rico.

Since it did not obtain the relief sought in the corresponding administrative hearing, the taxpayer appealed to the Superior Court, San Juan Part. That Court, through its

judge, Carlos Santana Becerra, affirmed the action of the former Treasurer of Puerto Rico. As to the two items corresponding to the amount of the Compañía de Cerámicas de Puerto Rico, Inc., the trial court reached the conclusion that it was not a bad debt of the petitioner as a business corporation, but rather a loss sustained by petitioner as a stockholder. It stated that an examination of the assets of the liquidated Company showed that there had always existed enough fixed capital consisting of buildings, equipment and machinery, with which to have paid the debt, although perhaps it was insufficient to pay also the capital subscribed by the petitioner, who besides being a creditor was the principal stockholder; that the breakdown of the account in two different years was an arbitrary action on the part of the officers of the petitioner corporation and it did not follow any reasonable determination of the circumstances rendering said debt worthless.

As to the two items corresponding to the account of the San Juan Construction Corporation, the trial court concluded that it was the case of two reserve accounts set up without the authorization of the former Treasurer, to confront a contingent liability and that the entries made in those accounts determined anticipated losses in transactions which were not closed at the time of deduction.

As to the first aspect of the question in issue, concerning the items of the Compañía de Cerámicas de Puerto Rico, Inc., the evidence on which the trial court based its findings of fact and its mixed conclusions of fact and of law, showed that the Compañía de Cerámicas de Puerto Rico, Inc. opened in 1940 an industrial plant located in Hato Rey where about $100,000 was invested; that of a gross total of 1278.50 shares, the petitioner San Miguel & Cía., Inc. owned 314.6572 shares, and Marcelino San Miguel owned 105.1786 shares; that there are 250 shares owned by the Sucrs. de San Miguel Hermanos, S. en C., although it does not appear who were the owners of said Mercantile; that Marcelino San Miguel

was the president of the Compañía de Cerámicas de Puerto Rico, Inc. and Vice-President and General Manager of the petitioner San Miguel & Cía., Inc.; that in 1941 a fire destroyed the entire building and practically all the machinery and that the insurance did not exceed $10,000; that through a new contribution of capital the factory was again installed in Bayamón and the machinery reconstructed; that from 1941 until 1943 the corporation was under experimentation rather than operation; *that in 1943 they already had in mind to close the factory*, but Mr. Moscoso, of the Industrial Development Co., informed the officers of the Corporation that the Government of Puerto Rico was interested in developing the ceramics industry of Puerto Rico and wanted to join with them for the purpose of making new experiments; that for such purpose they gave the Corporation some money and the services of a technician; *about July or August, 1944* the Development Co. informed them that the Government of Puerto Rico had decided to buy the business "because the Government had a great deal of money to invest in a big new enterprise and they wanted to make a big industry"; that about October or November 1944, they agreed to sell everything for $60,000; that on May 31, 1943, the fixed capital of the Compañía de Cerámicas de Puerto Rico, Inc. amounted to $112,316.65 and the account that the Compañía de Cerámicas de Puerto Rico, Inc., had with the petitioner corporation San Miguel & Cía, Inc., on August 31, 1943, amounted to $51,402.90; that on May 31, 1944, the fixed capital of the Compañía de Cerámicas de Puerto Rico, Inc., amounted to $102,337.02 and the account of the Compañía de Cerámicas de Puerto Rico, Inc., with the petitioner corporation San Miguel & Cía, Inc., on August 26, 1944, amounted to $38,921.10; that on May 31, 1945, the two items determined as bad debts, that of $15,000 and that of $36,402.90, amounting to $51,402.90, were paid to the petitioner by the Compañía de Cerámicas de Puerto Rico, Inc.

In connection with the second aspect of the question in dispute, concerning the items of the San Juan Construction Corporation, the evidence on which the trial court based its findings of fact and its mixed conclusions of fact and of law showed that the San Juan Construction Corporation had been organized with a $2,000 capital; that the liabilities of the San Juan Corporation to the petitioner were of three kinds: (1) a charge account for materials, insurance premiums and other services furnished in the construction of three public projects; (2) some promissory notes of the San Juan Construction Corporation guaranteed solidarily by the petitioner; (3) a bond executed by the petitioner to the corporation which was in turn a performance bond for construction work carried on by the San Juan Construction Corporation; that on August 31, 1944, the petitioner opened in its books a reserve account of $50,000 for the following purposes:

"reserve specifically created for any probable losses in the account, securities, etc. of the San Juan Construction Corporation, as we have been able to justify upon examining the financial condition of said corporation and the losses which it will sustain upon termination of the construction contracts which it is performing to this date."

that on August 31, 1944, the account for materials, insurance premiums and other services amounted to $28,427.20 and the obligations guaranteed to the Chase National City Bank amounted to $159,228.34; that the petitioner in its income tax return for the tax year ending on August 31, 1944, deducted from its taxable income the entire reserve account set up to take care of the possible loss of the San Juan Construction Corporation; that on August 31, 1945, the petitioner opened in its books an addition to the former reserve account for $150,000, for the following purposes:

"we have increased the reserve specifically created on 8/31/44 to take care of any probable losses in the account, securities, etc. of the San Juan Construction Corporation, as we have been able to justify upon examining the financial condition of said

corporation and the losses estimated from the outcome of the operations up to the date thereof, in the termination of the construction contracts which it is performing to this date."

that on August 31, 1945, the account for materials, insurance premiums and other services amounted to $160,471.75 and the obligations guaranteed to the Chase National City Bank amounted to $213,736.47; that the petitioner in its income tax return for the taxable year ending on August 31, 1944, deducted from its gross income the amount of $135,279.78 of the reserve opened to take care of the possible extension of losses of the San Juan Construction Corporation.

■■ The applicable law to the case at bar is § 32 (a) (5) of Act No. 74 of August 6, 1925, as amended by Act No. 31 of April 12, 1941—13 L.P.R.A. 553, § 735—which provides: "(a) In computing the net income of a corporation or partnership subject to the tax imposed by section 731 of this title there shall be allowed as deductions . . . (5) Debts judged to be worthless *and charged off within the taxable year* (or in the discretion of the Secretary of the Treasury, a reasonable amount as a reserve for bad debts) ; and when satisfied that a debt is recoverable only in part the Secretary of the Treasury may allow such debt to be charged off in part." And § § 123 and 127 of Regulation No. 1 of the Income Tax Act of 1924.

Both the law and the Regulations allow a taxpayer to deduct bad debts by means of a charge-off or through the establishment of a reserve account authorized by the Secretary of the Treasury. When the taxpayer has elected one of the two methods authorized for the deduction of his bad debts, he cannot switch to the other without the consent of the Secretary of the Treasury.

If the taxpayer employs the charge-off method, before proceeding to enter the debt in his books as worthless, he must analyze all the circumstances surrounding said debt in order to determine with reasonable certainty that it is really a bad debt, in whole or in part, always taking into account

the true financial condition of his debtor and, where proper, the value of any security which may exist for the payment of the debt. He must also make certain whether the same is not collectible by legal means. The Secretary of the Treasury, in turn, is authorized to investigate whether in truth, after considering all the circumstances surrounding the debt, it is really a bad debt.

If the taxpayer decides to shift from the charge-off method to the reserve-account method, after being duly authorized by the Secretary of the Treasury, he must determine the amount of the reserve in conformance with the amount shown by said reserve at the end of the former tax year. Pursuant to § 123 of the Regulations, the amount of that reserve cannot be deducted in computing the net income of said former tax year, but the bad debts, prior to the tax year in which the change of method took place, may be charged-off against the reserve and deducted from the income corresponding to the year when charged, as if it were a charge-off. For the tax year running on the date when the change took place and for subsequent years, the taxpayer may add a reasonable sum to the reserve fixed for the former tax years, and the bad debts, subsequent to the establishment of the reserve, must be charged-off against the reserve as extended, but they may not be deducted from the income because the total amount of the extended reserve has been already deducted. The same rule prevails for the determination of a worthless debt in the case of a reserve: the taxpayer must analyze all the circumstances surrounding said debt, the financial condition of his debtor, the value of the security furnished, and the possibility of recovery by legal means, before charging it off against the reserve account.

 As a general rule it may be held that the taxpayer has the first opportunity to determine whether a debt is actually worthless. But this determination is not final and the Secretary of the Treasury has the second opportunity to determine whether it is worthless. If, after considering all

the circumstances surrounding said debt, the same proves to be worthless, the initial determination of the taxpayer must not be disturbed. If contrariwise, the taxpayer has not exhibited the diligence inherent in all good merchants, the Secretary of the Treasury is entitled to disallow the deduction whether the taxpayer used the charge-off or the reserve method.

■ In the deduction of a bad debt we must make three inquiries in order to perform our judicial function: (1) whether it is a debt, properly speaking, as defined in the tax law; (2) whether after considering all the circumstances surrounding the debt, the same really proves to be worthless; (3) if the debt proves to be worthless, the tax year in which its deduction should be made.

■■ For a debt to be deductible as worthless in tax law, it must exhibit the following characteristics: (1) the relation between the debtor and the taxpayer must be one of debtor and creditor; (2) the expectation of repayment must exist from the time the debt is contracted; *W. F. Young Inc.* v. *Commissioner of Internal Revenue*, 120 F. 2d 159, 166 (Mahoney) (1941); (3) the obligation of the debtor to pay the debt must not be subject to any future contingency; (4) the debt must be enforceable immediately; (5) the loss caused by the inability to collect must run to the taxpayer, 5 Mertens—*Law of Federal Income Taxation* 400–406, § 30.03 (Callagham & Company, 1953 ed.). This excludes all the obligations voluntarily paid or assumed by the creditor-taxpayer.

After the judicial inquiry is satisfied that it is really a *debt* and not a voluntary obligation assumed in the name of another, or a gift, or an extension of credit for any purpose other than to establish the required debtor-creditor relation, the nature of worthlessness has to be established through the consideration of all the circumstances making such debt worthless, whether totally or partially, such as the economic

insolvency of the debtor, the insufficiency of the security furnished to guarantee the payment of the debt, if any, and the uselessness of any steps for compulsory collection through legal means.

But it does not suffice to conclude that there is a debt and that it is worthless; it must also be determined to what taxable year the deduction of the bad debt belongs. Section 123 of Regulation No. 1 of our Income Tax Act of 1924 provides that: "Where all the surrounding and attending circumstances indicate that a debt is worthless, either wholly or in part, the amount which is worthless and charged off or written down to a nominal amount on the books of the taxpayer shall be allowed as a deduction in computing net income. There should accompany the return a statement showing the propriety of any deduction claimed for bad debts. No deduction shall be allowed for the part of a debt ascertained to be worthless and charged off prior to January 1, 1921, unless and until the debt is ascertained to be totally worthless and is finally charged off or is charged down to a nominal amount, or the loss is determined in some other manner by a closed and completed transaction. Before a taxpayer may charge off and deduct a debt in part, he must ascertain and be able to demonstrate, with a reasonable degree of certainty, the amount thereof which is uncollectible."

■■ Pursuant to the state of law prevailing in Puerto Rico, under the provisions of Income Tax Act No. 74 of August 6, 1925, identical with those prevailing prior to 1942 in the federal revenue statute, the bad debt deduction is subject to two conclusions: (1) the determination of the. worthlessness of the debt after consideration of all the circumstances which we have already examined and (2) the charge-off in taxpayer's books, during the same year in which it is determined to be worthless, of part or all of the debt by means of a direct charge-off, if that is the method

employed by the taxpayer, or through an entry in the reserve, if the taxpayer employs the reserve method: 5 Mertens—*Law of Federal Income Taxation* 397, § 30.01, end of footnote 7. Since all bad debts may be said to be losses —5 Mertens 416, § 30.14 (*op.* and *ed. cit.*), *Barquet Bros.* v. *Treasurer*, 39 P.R.R. 637, 639 (Wolf) (1929); *D. Velasco & Co.* v. *Sancho Bonet, Treasurer*, 51 P.R.R. 54, 58 (Córdova Dávila) (1937); *Squier* v. *Commissioner of Internal Revenue*, 68 F. 2d 25, 26 (Hand) (1933); *Austin* v. *Helvering*, 77 F. 2d 373, 374 (Martin) (1935); *United States* v. *Burrows Bros. Co.*, 133 F. 2d 772, 74–75, (Martin) (1943) —the general rule should be that a bad debt deduction corresponds to the taxable year when the possibility of a total or partial reimbursement disappears: 5 Mertens 315–17, § 28.71 (*op.* and *ed. cit.*) the burden of proof being on the taxpayer: 5 Mertens' 499, § 30.82 (*op.* and *ed. cit.*), *Greer-Robbins Co.* v. *Commissioner of Internal Revenue*, 119 F. 2d 92, 93, (Denman) (1941). Mere general conclusions on the taxpayer: 5 Mertens 499, § 30.82 (*op.* and *ed. cit.*), are not sufficient to sustain a bad debt deduction. 5 Mertens 440, § 30.29 *(op.* and *ed. cit.), Reading Co.* v. *Commissioner of Internal Revenue*, 132 F. 2d 306, 309, (Jones) (1942).

Pursuant to our own Regulations it must also be determined whether it is a closed transaction, in the year when the total or partial deduction is claimed.

▬▬▬ In the case at bar, the taxpayer had adopted the charge-off method, and without the consent of the former Treasurer of Puerto Rico, changed to the reserve method. The result is that any accounting of the bad debt reserve, as to the initial sum as well as to the subsequent addition is void, and the charge-off method prevails. 5 Mertens 499, § 30.81 (*op.* and *ed. cit.*). Although there is no direct proof in the evidence of the accounting method employed by the taxpayer, we take notice of the statement contained in the brief of the Secretary of the Treasury to the effect that

the taxpayer employs the accrual-basis system. Using the analogy of "loss" we could say, as Mertens does, that irrespective of the accounting system employed by the taxpayer, "the fundamental point is whether there is a closed transaction and whether the possibility of reimbursement or recovery by one mechanism or another has disappeared." 5 Mertens 315–16, § 28.71 (*op*. and *ed. cit.*).

Having expounded the general theory as to the deductibility of worthless debts, we shall now examine the assignments of error presented in this appeal. As to the account of the Compañía de Cerámicas de Puerto Rico, Inc., the petitioner seeks relief against the following incorrect pronouncements of the trial court: (1) that the Compañía de Cerámicas de Puerto Rico, Inc., was a subsidiary of petitioner San Miguel & Co. Inc.; (2) that the deduction of $15,000 in 1943 and the deduction of $36,402.90 in 1944 lacked reasonable or rational basis and were only prompted by the capricious determination of Marcelino San Miguel, president of the Compañía de Cerámicas de Puerto Rico, Inc. and vice-president and general manager of San Miguel & Co. Inc.; (3) that since the liabilities of the debtor corporation did not exceed the assets of the corporation during the years when appellant took its deductions, the analysis of said liabilities did not constitute a legal or rational basis or event or factual circumstance sufficient to warrant a deduction of the items in controversy in computing its net income in said years.

It should be noticed that the trial court does not conclude as a matter of fact, that the Compañía de Cerámicas de Puerto Rico, Inc. was a subsidiary of the petitioner San Miguel & Co., Inc. It is in its conclusions of law that it refers to the possible control of one corporation by the other. Assuming, without deciding, that the evidence before the trial court was insufficient to determine the corporate control by the creditor corporation of the stock-owned sub-

sidiary, there is not the slightest doubt that in passing upon the taxpayer's inability to collect the company's debt, the trial court could have considered the fact that the creditor itself was the principal stockholder of the debtor corporation, that the vice-president and general manager of the creditor corporation happened to be the president of the debtor corporation. Therefore, we cannot use as ground for reversal a phrase which is more or less unrelated to the true doctrine applied in the solution of the question.

The explanation given by plaintiff's only witness, Marcelino San Miguel, as to the break-down of the worthless debt of the Compañía de Cerámicas de Puerto Rico, Inc. in two separate taxable years, is not satisfactory. Mr. San Miguel testified that after taking into consideration all the factors, he recommended "killing" the debt in the manner in which it was done. Therefore, it is a mere conclusion which, as we have seen, is not sufficient to meet the taxpayer's duty of proving the circumstances which warrant the total or partial deduction. The analysis of the evidence introduced in the trial court, and to which it gave credit, established that in 1943, when the first deduction of $15,000 was made, there was enough fixed capital to have paid the debt if there was the intention to close the factory; in that same year 1943, the Development Company had contributed new capital and technical advise. In 1944, the year in which the second deduction of $36,402.90 was made, the Development Company had already told the directors of the corporation of its interest in buying the factory, before the taxable year had terminated; in October or November 1944, the Development Company had purchased the factory. On May 31, 1945, six months later, the total amount of the debt had been recovered (exhibit 4 of both parties). In this situation it is very difficult to consider the transaction involved as a closed transaction subject to a contingent refund. It is no small wonder that the trial court considered insufficient the reason adduced for the determination of worthlessness.

340

 The evidence discloses that in the balance sheet of the Compañía de Cerámicas de Puerto Rico, Inc., on May 31, 1943, the current assets, the fixed capital and other items amounted to $177,224.78, and the liabilities, not including the capital debt, amounted to $146,686.67; that in the balance sheet of that same corporation on May 31, 1944, the current assets, the fixed capital and other items amounted to $166,079.78. During those two years the real deficit of the corporation was the account of subscribed and paid-in-capital. The isolated analysis of the capital assets, consisting of buildings, machinery and other tangible property, reveals that on May 31, 1943, the fixed capital of the debtor corporation was $112,316.65 and on August 31, 1943, the debt owed by the corporation to the taxpayer-creditor was $51,402.90; on May 31, 1944, the fixed capital of the debtor corporation was $102,337.02 (reduction by depreciation), and on August 31, 1944, the debt owed by the corporation to the taxpayer-creditor was $39,921.10. Although, perhaps, from a strict mathematical point of view, it cannot be concluded that in the years 1943 and 1944 the petitioner's assets exceeded the liabilities, the practical interpretation of the facts which underlie judicial common sense in controversial questions connected with the tax law, admits the isolated analysis of particular items for the purpose of determining the true economic liability of the corporation in order to determine the character of worthlessness of its debts. The marginal conclusion of the trial court to the effect that it was not a worthless debt but rather a possible capital loss is supported by the evidence.

 In connection with the accounts of the San Juan Construction Corporation, the petitioner seeks relief against the following incorrect pronouncements of the trial court: (1) holding that the $50,000 deduction in 1944, and the $135,279.78 deduction in 1945 were not charged-off as worthless debts; (2) holding that the petitioner and appellant

"created as a thing apart, and with the alleged sums of $50,000 and $135,279.78, certain reserves which were not reserves for bad debts, but reserves to confront a contingent liability covering possible losses in advance, in connection with transactions not terminated upon deduction date"; (3) holding that the balances or debts in the charge account of the San Juan Construction Corporation with the plaintiff-appellant on August 31, 1944 and 1945 were not on said dates bad or worthless debts deductible in computing appellant's net income.

From the joint exhibit No. 8, which represents the accounts of the San Juan Construction Corporation with the plaintiff and appellant in the case at bar, it does not appear that said items were charged-off as a portion declared worthless. Explaining this situation, Marcelino San Miguel, petitioner's sole witness, testified: "this is the charge account sheet of the accounting machine. It produces several copies, and at the end of each month a copy is sent to the customers. The policy is that when the amount of a debt is reduced in the bill because it is considered worthless, the client is not notified that part of his bill is considered worthless, but that we merely consider it as a deduction from his bill." (T. E. 65.) However, in the accounts of the Compañía de Cerámicas de Puerto Rico, Inc., the deductions of the amounts considered worthless appear charged-off although the same accounting system described by the witness is involved. The witness, confronted with this situation, explained that the charge-off of the items of the Compañía de Cerámicas de Puerto Rico, Inc., was due to the fact "that the liquidation of this company had already been considered and it was a fact already known to the stockholders that it was a total loss. The discount was more than justified." (T. E. 65.)

The trial court had before it two contradictory versions as to the accounting of two different sets of items for a single concept, and it decided to discard the oral version of the

petitioner's evidence and abide by the contents of the documentary evidence of that same petitioner. After examining the charge account sheet, it is difficult to consider it as a bill in the ordinary sense. Hence, we cannot consider the corresponding finding of fact as clearly erroneous.

There is no doubt that the original reserve account and the subsequent addition to the reserve were set up for *probable losses* in the account, securities and other liabilities of the San Juan Construction Corporation in the termination of the contracts, which were under way on the date that the reserve account was established. Since the permission of the former Treasurer of Puerto Rico to open those reserves was not requested, we must determine their effectiveness as if it were a case of a charge-off of a worthless debt. It is well known that in contracts for public works no payment is made until the inspectors of the projects certify the termination of specific units of construction. This implies that there is no possible way to determine any worthless debt unless it is proved what part of the project has been performed up to that date and what part of the cost has been received. In the details of the accounts for materials corresponding to the Trujillo acqueduct and the sewage system of Loíza Street, which seem to be the only two of the three projects terminated on August 31, 1945, the two items charged-off are of $16.80 and of $527.97, respectively. The rest are obligations signed by the taxpayer to a bank as solidary surety with other persons to obtain money for those same projects and a performance bond. Undoubtedly, on August 31, 1944, and on August 31, 1945, there was no way to determine its amount since the main project was under construction.

The reasons alleged by the taxpayer for anticipating the determination of worthlessness are very unconvincing. Mr. San Miguel testified: "I could not leave it for the last minute . . . I understand that if we had done so, the Treasurer could have told us: Sir, why did you leave till the last

minute a loss of two hundred thousand and some dollars when the accounting revealed that year after year you have been carrying losses over .... ?" (T. E. 73.) Later he says that on August 31, 1945, only part of the debt was "killed", namely $135,279.78, and not the $150,000 of the extension of the reserve "in order not to put red numbers in the books." (T. E. 76.) Considering this reserve for bad debts and its subsequent extension as charged-off, which is the only way in which we can treat it, undoubtedly it was not the case of a closed transaction, where the partial or total amount of the portion actually worthless had already been ascertained, and the trial court's conclusion, to the effect that it was not a bad debt but rather a contingent liability covering possible losses in advance, in connection with transactions not closed upon deduction date, is not clearly erroneous.

 Nevertheless, could the debt owed by the San Juan Construction Corporation to the petitioner be considered as a "debt" as the word is used in tax law? Here is a corporation with a capital of $2,000 to which the petitioner extends a credit for construction materials amounting, on August 31, 1944, to $28,427.20, on August 31, 1945 to $160,471.75, and on August 31, 1946 to $248,670.56. Furthermore, the petitioner had guaranteed solidarily with other persons the debts of said debtor corporation with the Chase National Bank up to the sum of $605,000. Furthermore, the petitioner was surety to a bonding company which in turn guaranteed the performance of the public works for an indeterminate sum.

The trial court refused to acknowledge the debtor-creditor relationship which must exist in a worthless debt because it believed that the debtor corporation was merely an instrument employed by the petitioner in order to devote itself directly to the construction of public works. Petitioner's own witness testifies that in the years 1943, 1944 and 1945 the business of construction materials was subject to many

emergency restrictions, that "no constructions or repairs could be made; everything was controlled by a federal agency established here," *no materials could be sold to any one* without a specific authorization . . . "nothing could be sold without priority . . . that it was a matter of great concern because in the first place *nothing could be bought* without priority and then the priority had to be secured." (T. E. 36–7.) Although this trend of thought is not elaborated in the evidence, if connected with the eloquent evidence of the three accounts, it cannot be held that the trial court's conclusion was clearly erroneous.

It is likewise unquestionable that the expectation of collecting the debt at the time it was contracted, another characteristic element of the worthless debt, as we have seen, was quite remote. The explanation given by the only witness of the petitioner for this extension of credit so out of proportion with the financial status of the debtor is that since they already had "one foot in the boat" they had to ride along, giving the impression that rather than for the re-sale and profit purpose of any ordinary transaction, the extension of credit was made to reduce the taxpayer's possible loss in other obligations.

Although the extension of further credit does not invariably negative a claim of worthlessness, it must establish that, above all, the additional advances are made to safeguard the debt considered worthless and not other obligations which may exist between the creditor and the debtor. In the latter instance, the extension of further credit contradicts the alleged worthlessness: 5 Mertens 444–45, § 30.33 (*op.* and *ed. cit.*).

If the obligation to pay the debt is subject to a future contingency, even under an accrual basis system, the taxpayer cannot deduct the debt since the final determination of worthlessness cannot be made within the taxable year when the deduction is claimed: *Bravo* v. *Treasurer*,

76 P.R.R. 145, 148 (Pérez Pimentel) (1954), footnote 2; *Cía. Marítima, etc.* v. *Descartes, Treas.*, 78 P.R.R. 560, 567 (Belaval) (1955). The taxpayer should have waited until the final liquidation of the three contracts for public work in order to determine finally the worthlessness of the debt deducted.

For the foregoing reasons the judgment will be affirmed.

Mr. Justice Saldaña did not participate herein.