M. A. BURNS MFG. CO. v. COMMISSIONER OF INTERNAL REVENUE.

No. 6611.

Circuit Court of Appeals, Ninth Circuit. June 20, 1932.

J. S. Lamson, of San Francisco, Cal., for petitioner.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key, F. Edward Mitchell, and J. P. Jackson, Sp. Assts. to Atty. Gen. (C. M. Charest, Gen. Counsel, and Prew Savoy, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for respondent.

Before WILBUR and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

This appeal, coming to us on a petition to review a decision of the Board of Tax Appeals, 21 B. T. A. 749, involves the assessment of $1,696.50 against petitioner as deficiency in income tax for the calendar year

1925. The facts, as set forth in the findings of the Board, are not in controversy, and are as follows:

"The petitioner is a California corporation with principal offices at San Francisco. Ever since its organization in 1904 it has been engaged in manufacturing lumber, red wood shingles, and boxes.

"In 1910 the petitioner's president organized the Burns Lumber Co., which was operated at a loss until 1918, when it was voluntarily liquidated through the San Francisco Board of Trade. At the time of its going into liquidation, the Burns Lumber Co. was indebted to the First National Bank of Eureka, Cal., upon a note for $20,000. The petitioner's president, Burns, who was likewise president of the failing corporation, was surety upon this note; and the petitioner, in aid of its own credit took up that company's note and replaced it with a new demand note for the sum of $20,000. At the suggestion of the bank this note was executed by M. A. Burns, in favor of the petitioner, and endorsed over by the latter to the bank; but with an understanding, however, between petitioner and Burns that, as between themselves, it, and not he, would be the principal debtor thereon.

"In distributing the assets of the Lumber Co. the Board of Trade, on November 26, 1919, paid to the bank $3,137.58, which was credited upon the face of petitioner's note. On December 18, thereafter, a new note for the reduced amount, similar in form to the other, was given by the petitioner to the bank. Five successive renewals through new notes were made of this indebtedness, the last being on March 7, 1923.

"In January, 1924, the petitioner closed a sale of some timber lands in which it owned equities. In the deal it received, as part of the purchase, some second mortgage installment notes which it discounted with the First National Bank of Eureka. In settling with the petitioner in this transaction the bank retained $16,921.44, out of the proceeds due petitioner from the discount of the sale notes, as payment of the note then held by it against petitioner, which it thereupon canceled and returned to it.

"In computing its taxable gain from the sale of these timber lands the petitioner included as part of its cost the sum of $16,862.42, representing the amount withheld by the bank, and determined its net profit in the transaction to be $12,166.02. In making out its income-tax return for 1925, the petitioner took credit for $13,384.08, which it claimed represented a net loss carried forward from 1924. This claim the respondent denied in auditing that return, and determined the deficiency in controversy." Thus the loss of $16,862.42 claimed in 1924 is carried forward into 1925 to the extent of $13,384.08.

We are confronted at the outset with an important question, namely, whether the $16,921.44 paid by the Burns Manufacturing Company to the First National Bank of Eureka in 1924, in final satisfaction of the note for $20,000 first given to the bank in 1918, was deductible as a loss sustained during the taxable year and not compensated for by insurance or otherwise, as provided for in 26 USCA § 986 (a) (4); or whether it was deductible as a debt ascertained to be worthless and charged off within the taxable year, as provided for in 26 USCA § 986 (a) (5). Petitioner originally treated the amount as a loss; the Commissioner, in his sixty-day letter, treated the amount as a debt and, disallowing the deduction, said, " * * * In order to claim a deduction in 1924, it would be necessary to show that the debt was worthless and charged off the books within that year"; the Board of Tax Appeals determined the issue on the ground that the deduction claimed was a loss. Finally, the government, in the briefs presented to this court, contends that the amount in question may be considered in neither of these categories, but must be considered as a capital expenditure.

In our view of the case, the amount of $16,921.44 was a loss not compensated for by insurance or otherwise. While the original indorsement of the note of the Burns Lumber Company by the Burns Manufacturing Company created an implied obligation of the former to the latter, still we think the transaction failed to create an obligation that has the earmarks of a "debt" under the meaning of the statute.

Bouvier defines "debt" as "a sum of money due by certain and expressed agreement." There was here no agreement, nor indeed any expectation, that the lumber company could or would repay anything to the manufacturing company on the $20,000 note for which the latter was guarantor. Again, in 17 C. J. at page 1373, we find the following discussion of "debt":

"In a purely technical sense, it [a debt] is * * * a sum of money due upon contract, expressed or implied. In a large sense, the word means that which one person is bound to pay to another, or to perform for his benefit; a sum of money due from one person to another, whether money, goods or

services; due; all that is due under any form of obligation or promise."

■ When the lumber company became insolvent and went into voluntary liquidation, the manufacturing company, for a sufficient consideration (as found by the Commissioner), assumed the former's note to the bank. No return was expected, except the intangible benefit of "helping their own credit," and the payment that was eventually made on the note was simply an expenditure of money that must come under the category of "loss" and not under that of "debt." See, for a discussion of the difference between "debt" and "loss," Porter v. United States (D. C.) 20 F.(2d) 935, 937; Electric Reduction Co. v. Lewellyn (C. C. A. 3) 11 F.(2d) 493, 494, reversed on other grounds 275 U. S. 243, 48 S. Ct. 63, 72 L. Ed. 262.

26 USCA § 986 (a) provides:

"In computing the net income of a corporation subject to the tax imposed by section 981 of this title there shall be allowed as deductions: * * *

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise. * * *"

We must therefore determine whether the loss of $16,921.44 was "sustained" during the taxable year 1919, when the definite amount of the loss was ascertained, or during the taxable year 1924, when the note was finally paid off.

The authorities which we have examined deal primarily with "losses" in so far as they are losses on the value of stocks. We quote, however, from those whose reasoning is applicable by analogy here.

In the case of Royal Packing Co. v. Commissioner of Internal Revenue (C. C. A. 9) 22 F.(2d) 536, 538, this court said:

"A loss may be said to be actually sustained in a given year if, within that year, it reasonably appears that such stock has, in fact, become worthless. It is not requisite that there be a charge-off on the books of the taxpayer, and the ultimate fact of worthlessness may be shown by circumstances, as in other cases where that question is in issue. * * * [Cases cited.]"

In De Loss v. Commissioner of Internal Revenue (C. C. A. 2) 28 F.(2d) 803, 804, the court, in discussing when stock losses should be actually charged off, said:

"The shares were patently worthless and could never have any value. The trustees had declared that the creditors could never

be paid in full; the business was at an end; the highest estimate put by anybody upon the reserved assets left a deficiency, even if all the unadjudicated claims were disallowed. * * * So far as human foresight could go, the shares were worthless, and the petitioner might have deducted the loss. * * *

"Although it is, of course, true that any one is entitled to spread his losses as best he can in order to reduce his taxes, in interpreting the law we are not to assume that a system based upon yearly gains and losses was so contrived as to admit deviations in principle which must always operate to the taxpayer's advantage. * * *"

■ In the instant case the principle is the same. It was definitely ascertained in 1919, when the insolvent lumber company in the distribution of its assets made the final payment of $3,137.58 that was credited on the face of petitioner's $20,000 note at the bank, that the exact amount of petitioner's loss was $16,862.42. At that time the bank could, if it had chosen, have demanded payment and have taken any steps necessary to achieve collection at that time. The fact that the manufacturing company was granted grace to defer payment of the amount due until some future date does not affect the time that the loss was "sustained." To hold that a corporation, whose books are kept on the accrual system, could claim a deduction in tax only at the time its obligations were actually paid off, would, we think, be simply to allow a taxpayer to manipulate his books so as to take an undue advantage of the privileges allowed him. Such a holding would allow a taxpayer to claim a deduction in taxable income whenever it was most needed to cut down an unduly large income; it would violate the first requirement made of every taxpayer, whether his books are kept on the cash or on the accrual basis, namely, that his return clearly reflect his income for the taxable year.

Petitioner contends that the question of whether the amount was deductible in 1919 or 1924 brings the instant case squarely within the rule laid down by the Supreme Court in Eckert v. Burnet, 283 U. S. 140, 51 S. Ct. 373, 374, 75 L. Ed. 911. There the court said:

"The petitioner says that it was definitely ascertained in 1925 that the petitioner would sustain the losses in question. So it was, if the petitioner ultimately pays his note. So was the tax considered in United States v.

Mitchell, 271 U. S. 9, 12, 46 S. Ct. 418, 70 L. Ed. 799, but it could not be deducted until it was paid."

We think the Eckert Case must be distinguished from the one at bar in two ways:

1. In the Eckert Case and the Mitchell Case cited therein the taxpayer made his return on a cash basis, and under such a system of accounting it would have been impossible for him clearly to reflect his income if he deducted the amount paid on the notes until such amount was an actual disbursement; here, so far as the record shows, the taxpayer made his return on the accrual basis. The Board of Tax Appeals made no finding in that regard, but on the petitioner's returns for both 1924 and 1925, in answer to the question, "Is this return made on the basis of actual receipts and disbursements?" the answer was in each case "No."

2. In the Eckert Case the Supreme Court considered merely the effect of section 214 (a) 7, 26 USCA § 955 (a) (7), which provides for deductions for "debts ascertained to be worthless and charged off within the taxable year." The amount here under consideration was a "loss" and not a "bad debt" and consequently the decision in the Eckert Case is not controlling.

Petitioner cites also the case of Badenhausen v. Commissioner, 7 B. T. A. 910. Therein the taxpayer, who kept his books on the accrual basis, was an accommodation indorser on certain notes of the B Company. The latter became insolvent and did not pay the notes. The taxpayer did not pay the notes in 1921 or any previous year, but in 1921 he set up a contingent liability to cover the notes on his books and later in the same year charged the amount in question to profit and loss. The Board, after holding that no debt had been created as against the maker of the note which could be charged off because the notes had not been paid, later held that no loss had been sustained in 1921, and disallowed the deduction. In its opinion the Board said:

"The statute permits the deduction from gross income of losses 'sustained.' It does not permit the deduction of losses which may be sustained. The evidence of record does not show that the petitioner has ever sustained any loss in respect of his endorsement upon the notes."

That decision of the Board is, of course, not binding upon us here, nor do we find the language quoted persuasive. It seems to us that in the instant case the "loss" was sustained at the time the exact amount for which the petitioner would be liable became fixed, at the time when it became an obligation to the bank for which the latter could have demanded payment. The fact that the manufacturing company was allowed the privilege of using its credit to postpone the payment of the sum involved, and was not compelled to discharge the obligation before 1924, does not, it seems to us, mean that the loss was sustained in 1924 and not in 1919.

We are more impressed by and more in accord with the reasoning of the Board of Tax Appeals in the case of A. W. D. Weis v. Commissioner, 13 B. T. A. 1284, a case nowhere definitely overruled by the Board itself. There the taxpayer, who kept his books on the basis of cash receipts and disbursements, was engaged with a partner in a lumbering project in Arkansas. At first the taxpayer advanced cash out of his own resources, but later approximately $18,000 was borrowed from a bank. In the middle of 1919 it became probable that the venture would result in a loss, and in December of that year the taxpayer gave the bank his personal note for $9,336.25, the aggregate of the notes outstanding plus accrued interest thereon. At the close of 1919, after most of the lumber and materials on hand had been disposed of, it was definitely ascertained that the loss would amount to approximately $9,-000. The note for $9,336.25 signed by the taxpayer was renewed a number of times and finally paid in 1923. In the return filed by the petitioner for 1919, a loss was claimed of $9,336.25, which deduction was disallowed by the Commissioner.

The Board of Tax Appeals, in reversing the Commissioner and allowing the deduction for the year 1919, said:

"We are unable to agree with the respondent that no loss is ever sustained until paid in cash where the cash-basis taxpayer is the user of borrowed capital. So broad a rule is contrary to the liberal provisions of the statutes in the matter of * * * determining income and is impracticable of general administration. It is obviously impossible to earmark the capital employed in every transaction which results in loss. * * *

"If the principle for which the respondent herein contends is accepted, taxpayers may determine for themselves the years and the income to which deductions on account of losses are applicable. In each of the years here involved the record is clear that the petitioner had large resources, enjoyed ample credit, and was solvent. If his business sit-

uation at the end of 1919 had indicated a loss for that year the deduction here sought would have been worthless to him, since there would have been no income against which it could have been charged nor any tax liability to be reduced. If he had reason to anticipate large profits and substantial taxable income in the following year it would have been to his advantage to defer his claim for a deductible loss. To do so, if the theory of the respondent is sound, it was only necessary to borrow money and arrange for the payment of the notes in the next year. It is hardly reasonable to impute to Congress an intent to permit taxpayers to elect, for their own benefit, the years in which business losses should be deducted from income. * * *

"We are of the opinion that all the losses here in question were sustained in the years in which the several investments became worthless. In such respective years each of the deals became a closed transaction and the petitioner's net assets were reduced in the amount of the loss sustained. It is not material whether such losses were met by the payment of cash from funds in hand or with cash borrowed from the bank and evidenced by notes payable in a subsequent year. The loss had been sustained and the transaction had been closed by a cash payment. The use of the petitioner's credit to secure funds from the bank was a new and different deal and had no more to do with the petitioner's tax liability than any other borrowing that he did in the taxable year. Cf. Bob H. McGinnis, 4 B. T. A. 209.

"If the deductions herein claimed are allowed for the respective taxable years in which the losses occurred, correct income and true tax liability for such years may be determined. If postponed, manifestly income of the years to which they are eventually applied and to which they have no proper application will be distorted."

This decision of the Board, in so far as it deals with a case in which the books of the petitioner were kept on a cash basis, has been overruled by the decision of the Supreme Court in the Eckert Case, supra, but we think its reasoning and its language particularly applicable here, where the books of petitioner were kept on the accrual basis.

We have considered many other decisions of the Board of Tax Appeals, including Morris Sass v. Commissioner, 7 B. T. A. 557; Id., 12 B. T. A. 156; Id., 17 B. T. A. 261; Haskett Lumber Co. v. Commissioner, 19 B. T. A. 714; S. R. Davis v. Com'r of Internal Revenue, 9 B. T. A. 755, reversed by the Circuit Court of Appeals for the Eighth Circuit on October 24, 1928, without written opinion, etc. None of these are persuasive here.

Holding that the loss here was sustained during the taxable year 1919, and was properly charged off during that year, if at all, it is unnecessary for us to consider the other questions raised in the briefs.

The decision of the Board of Tax Appeals is affirmed.

Affirmed.