## READING CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7991.

Circuit Court of Appeals, Third Circuit.

Argued July 15, 1942.

Decided Oct. 23, 1942.

Rehearing Denied Nov. 19, 1942.

---

John E. McClure, of Washington, D. C., (O. H. Chmillon, David W. Richmond, and Maude Ellen White, all of Washington, D. C., and W. I. Woodcock, Jr., and Alfred W. Hesse, both of Philadelphia, Pa., on the brief), for petitioner.

Samuel H. Levy, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to the Atty. Gen., on the brief), for respondent.

Before JONES and GOODRICH, Circuit Judges, and LEAHY, District Judge.

JONES, Circuit Judge.

In its income tax returns for the years 1936 and 1937 the petitioner made certain deductions for losses and bad debts which the Commissioner of Internal Revenue disallowed. The Board of Tax Appeals sustained the consequent deficiency assessments in a decision which the taxpayer has petitioned us to review.

The pertinent sections of the revenue law are § 23(k) of the Act of 1936, 26 U.S.C.A. Int.Rev.Acts, page 828, which permits the deduction from gross income of debts ascertained to be worthless and charged off within the taxable year, and § 23(f) of the same Act, which allows for the deduction from gross income of losses (not compensated for by insurance or otherwise) in the year in which they are sustained. The Board of Tax Appeals found that the bad debts and some of the losses claimed by the taxpayer were respectively ascertained and sustained in years prior to the years for which the taxpayer claimed them as deductions, and that the balance of the losses claimed were for advances voluntarily made which never constituted debts. The questions which the petitioner raises relate principally to the Board's ultimate conclusions of fact rather than the findings from which the Board's conclusions are drawn.

On June 25, 1933, the railway system of the Atlantic City Railroad Company (hereinafter referred to as Atlantic), then controlled by the petitioner, was unified with the system of the West Jersey and Seashore Railroad Company, then controlled by the Pennsylvania Railroad Company, under an agreement between the petitioner and the Pennsylvania Railroad Company. The unified systems became the Pennsylvania-Reading Seashore Lines (hereinafter referred to as Seashore). The railways thus unified served points in southern New Jersey from Camden on the west to Atlantic City, Cape May and other seaside resorts on the east and south. Prior to the unification, each of the constituent railway systems had been operated unprofitably for many years. Their respective gross revenues had continued to decline because of the diversion of travel by automobile and bus, whose operations had been greatly facilitated by the expansion and improvement of New Jersey's highway system. One of the purposes to be served by the unification was an anticipated annual saving of more than $1,600,000 in the operating expenses of the unified railways. This purpose was promptly and fully realized. But the continued increase in travel by automobile and bus was not checked by the unification, nor was it reasonable to expect that the unification would produce any such result. Under the terms of the unification agreement the petitioner obligated itself to make advances to Seashore to meet its operating and other expenses. From the very outset, Seashore was operated at a loss notwithstanding the realization of the anticipated operating economies, for the gross revenues continued to decline. As a consequence, the petitioner made advances to Seashore for the years 1933 to 1935, both inclusive, as required by the agreement, in the aggregate amount of $2,805,000. This sum the petitioner charged off in the year 1936 as a bad debt which it deducted accordingly from its gross income for that year.

For a number of years prior to the unification (1924-1932), the petitioner had made advances to Atlantic each year on account of the latter's operating and other expenses. The amounts so advanced had been charged off by the petitioner as worthless and uncollectible at the close of each respective year in which the advances were made. But, as to its advances to Seashore from 1933 to 1935, the petitioner waited until 1936 before charging them off. It is the petitioner's contention that in so doing it acted in a reasonable manner by awaiting three years operational experience before making any determination as to

the results to be expected from the unification.

The Board concluded however that, under the circumstances shown, a belief that the results of the unification would make the petitioner's advances collectible was not reasonable and that the "advances made in the years prior to 1936 were worthless before that year, and * * * should have been so ascertained and charged off."

Under the unification agreement the petitioner became the owner of one-third of the capital stock of Seashore. These shares the petitioner determined to be worthless in 1936 and deducted their cost as a loss for that year. The Board found that the shares had become worthless prior to 1936. As already stated, Seashore's operations were conducted at a continuous loss from the outset.

The petitioner was the owner of the capital stock of the Delaware River Ferry Company (hereinafter referred to as Ferry), which operated ferries for the transportation of passengers and freight to Camden as a feeder for Atlantic. After the unification the ferry route was no longer used as a railroad feeder, and on April 17, 1936, approval was obtained from the Interstate Commerce Commission to discontinue service by Ferry "by or in connection with any railroad." Ferry however continued to operate for other purposes until its charter expired in 1938. Ferry's history had been one of continuous losses for many years. Its accumulated deficit, which in 1930 amounted to $3,851,055.16, had reached the sum of $4,201,462.57 in 1936, and its assets were but a fraction of its liabilities. It was in that situation that the petitioner, in 1936 and 1937, made further advances to Ferry which it sought to deduct from its gross income for those years as bad debts. The Board found that the advances so made by the petitioner had been voluntarily made and were worthless as debts when made.

The petitioner also owned substantially all of the stock of the Schuylkill Navigation Company which it had acquired in 1884. Since 1896 no interest on roundly $8,500,000 of the Navigation Company's loans had been earned. By January 1, 1931, the overdue interest on all of the Navigation Company's loans amounted to roundly $17,000,000, practically all of which was due the petitioner. On January 1, 1936, the Navigation Company was further indebted to the petitioner in the sum of $2,385,505.17 on an open account for advances made by the petitioner to meet deficits from the Navigation Company's operations. Notwithstanding this situation, the petitioner made further advances in 1936 and 1937 to pay operating deficits of the Navigation Company in each of those years and sought to deduct them from its gross income in the same years by charging them off as worthless. Here, again, the Board found that the advances had been made voluntarily and were worthless as debts when made.

It is the petitioner's contention that the Board erred in applying the objective test to determine the time of ascertainment of the worthlessness of the debts charged off. We think, however, that the Board in arriving at its ultimate conclusions gave appropriate legal effect to the findings of fact which it derived from the direct evidence.

It is of course true that a taxpayer is the initial actor in ascertaining the worthlessness of a debt and in charging it off accordingly. And, if the action taken by a taxpayer in such regard appears to have been reasonable, a commensurate deduction from gross income is allowable for tax purposes. Hamlen v. Welch, 1 Cir., 116 F.2d 413, 419; Herskovits v. Commissioner, 2 Cir., 110 F.2d 272, 273; Commissioner v. MacDonald Eng. Co., 7 Cir., 102 F.2d 942, 944; Blair v. Commissioner, 2 Cir., 91 F.2d 992, 994. But the fact that the taxpayer may have a certain leeway in point of time for voluntary action in determining when a debt becomes worthless does not mean that he has carte blanche to determine with finality the fact which he thus asserts. In any case, the taxpayer's judgment as to the worthlessness of a debt and the action he takes with respect thereto must be reasonable. See Brown, The Time for Taking Deductions for Losses and Bad Debts for Income Tax Purposes (1935) 84 U. of Pa.L.Rev. 41, 62.

The petitioner, in urging that the reasonableness of its conduct in charging off and deducting the bad debts claimed should be determined by a subjective rather than an objective test, relies principally upon two decisions by the Court of Appeals for the Second Circuit. In the more recent of those cases (Mayer Tank Mfg. Co. v. Commissioner, 126 F.2d 588, 591) the court recognized the existence of the two tests and that both have been variously applied by the courts, but the actual holding in the Mayer Tank case was that the subjective

test had no place "with reference to the issue whether, in fact, the debt lacked value." In the other case (Rosenthal v. Helvering, 124 F.2d 474, 476) the court did hold that the subjective test was to be applied in determining the reasonableness of a taxpayer's action in charging off and deducting a bad debt, but, recognizing that the subjective test if arbitrarily applied would offer facile opportunity for tax evasion, the court added the very important qualification that "the taxpayer has the burden of proving a negative—i. e., he must show that he did not 'ascertain' the debt to have been 'worthless' before the year in question", saying further that "the fact a prudent person would have 'ascertained' that fact earlier is always evidence that the taxpayer did so himself." Neither of these cases furnishes any support for the petitioner's contention.

In Curry v. Commissioner, 117 F.2d 307, 310, the Court of Appeals for the Second Circuit had also said that "While the test of ascertainment is a subjective one * * * proof that in a particular year the facts known to him [taxpayer] indicated the worthlessness of the debt and that it was then actually worthless seems to justify an inference that he then ascertained it to be worthless." In Jones v. Commissioner, 7 Cir., 38 F.2d 550, 554, where the taxpayer's ascertainment of debt worthlessness was sustained, his conclusion and consequent action in such regard were found to have been the result of "reasonable investigation" and the "reasonable inferences from the information thus obtained". In other words, the debt had become worthless in fact at the time justifiably ascertained by the taxpayer. In a later case, the same Court of Appeals applied the so-called objective test. See Sabath v. Commissioner, 7 Cir., 100 F.2d 569, 573.

■ By the objective test, the taxpayer is under the duty of selecting, as the time for charging off a bad debt, the year in which a prudent person, having the same information as was available to the taxpayer, would have concluded that the debt was worthless. See Sabath v. Commissioner, loc. cit. supra; also Avery v. Commissioner, 5 Cir., 22 F.2d 6, 7, 8, 55 A. L.R. 1277. Fundamentally, each of the tests is a method for determining an ultimate fact; and, between the two, the objective test would seem to be the preferable. It has in its favor a standard of knowledge and conduct applicable to one and all alike, which necessarily makes for more uniform administration.

■■ But, whether the test applied be the subjective test as qualified or the objective test, we think that the findings of the Board fully warranted its conclusion that the advances made by the petitioner to Seashore in 1933, 1934 and 1935 "were ascertained to be worthless before 1936". Perhaps it will be suggested that, under the subjective test, the Board should have gone further and found specifically that the petitioner had in fact ascertained the advances to be worthless in a year prior to 1936. But any such requirement would be to overdo formality for no helpful purpose. The Board's conclusion that the advances were worthless before 1936 implies that the petitioner had ascertained them so to be. Cf. Curry v. Commissioner, supra. Even under the subjective test, the burden was upon the petitioner to prove that it "did not 'ascertain' the debt to have been 'worthless' before the year [1936]." See Rosenthal v. Helvering, supra. The only question remaining, therefore, with respect to the petitioner's advances to Seashore in 1933, 1934 and 1935 is whether the Board's findings, upon which its conclusion as to the ascertainment of debt worthlessness is founded, are supported by substantial evidence.

■ The advances made by the petitioner in 1936 and 1937 to Ferry and to the Navigation Company in the knowledge that they could never be repaid,—certainly not within the current year in which the petitioner promptly charged them off,—are of course not deductible as bad debts. Advances made in such circumstances have been aptly characterized as being either gifts or contributions to capital but not as debts. See American Cigar Co. v. Commissioner, 2 Cir., 66 F.2d 425, 427. In Eckert v. Burnet, 283 U.S. 140, 141, 51 S.Ct. 373, 75 L.Ed. 911, the Supreme Court said that, where a debt is worthless when acquired, there is nothing to charge off, and that the words of the statute cannot be taken to include a case of that nature. See, also, W. F. Young, Inc., v. Commissioner, 1 Cir., 120 F.2d 159, 165. The Board found that the advances to Ferry and to the Navigation Company had been made with knowledge of their worthlessness and uncollectibility as debts and, therefore, held them to be voluntary contributions. This conclusion rightly flows from the

findings and, if the findings are supported by substantial evidence, then the deductions claimed for those advances were properly disallowed.

■■■ The disallowance of the petitioner's deduction in 1936 for loss on account of its stock in Seashore was likewise proper if the Board's finding that the stock was worthless prior to 1936 is supported by substantial evidence. Losses not compensated for by insurance or otherwise are deductible under § 23(f) only in the year in which they are sustained. No problem of the taxpayer's ascertainment of the time of the loss is involved in such instance. Eckert v. Burnet, supra, 283 U.S. at page 142, 51 S.Ct. 373, 75 L.Ed. 911; Rosenthal v. Helvering, loc. cit. supra; Osterloh v. Lucas, 9 Cir., 37 F.2d 277, 278. The taxpayer's right to deduction for losses depends upon the time they were in fact sustained.

■■■ We have then to consider whether the Board's findings in the particulars hereinabove specified are supported by substantial evidence, bearing in mind that it is the Board's function, and not ours, "to weigh the evidence, to draw inferences from the facts, and to choose between conflicting inferences." Wilmington Trust Co. v. Helvering, 316 U.S. 164, 168, 62 S.Ct. 984, 986, 86 L.Ed. 1352. As to the conclusiveness of the Board's findings when supported by substantial evidence see, also, Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343; Connelly v. Commissioner, 3 Cir., 121 F.2d 686, 687; Maddas v. Commissioner, 3 Cir., 114 F.2d 548, 549; Lauriston Inv. Co. v. Commissioner, 9 Cir., 89 F.2d 327, 328. Nor was the Board bound by the opinion evidence of the petitioner's experts. Such testimony is no more conclusive of the facts which it is offered to establish than is oral testimony in general. The weight to be given testimony of expert witnesses is for ·the Board to determine and it may reach a conclusion from the facts in the light of its own general knowledge, experience and judgment. Nichols v. Commissioner, 3 Cir., 44 F.2d 157, 159; Anchor Co. v. Commissioner, 4 Cir., 42 F.2d 99, 100. The case of Pittsburgh Hotels Co. v. Commissioner, 3 Cir., 43 F.2d 345, 347, does not derogate from this principle. There the decision of the Board was reversed because it was dealing with a peculiar local situation in regard to which the Board members lacked independent knowledge and experience, and there was no other evidence in the case but that of the experts. The effect of the ruling in the Pittsburgh Hotels case was that the Board's findings were not sustained by any substantial evidence.

■■■ In the present case it is not so much a matter of what the facts are as it is of what weight shall be given to them and what inferences may be drawn therefrom. For the most part, the facts are not in dispute. The controversy revolves primarily around the conclusions which the Board drew from the facts, as it found them,—a matter peculiarly for the competence of the Board. Examination of the evidence plainly discloses that the findings of the Board are fully sustained by substantial evidence. In fact, the testimony of the petitioner's experts is of itself sufficient to sustain the Board's findings.

■■■ The petitioner further urges that, if the advances which it made to Ferry and to the Navigation Company are not deductible as bad debts, they should be allowed as deductions for losses or for ordinary and necessary business expenses. But the advances made by the petitioner to those companies were made voluntarily and not from any legal obligation. There is nothing therefore to give them the character of losses. Sam P. Wallingford G. Corp. v. Commissioner, 10 Cir., 74 F.2d 453, 454. Nor do those advances supply the requirement, incident to deductions for business expenses, viz., that they be both necessary and ordinary. Welch v. Helvering, 290 U.S. 111, 113, 114, 54 S.Ct. 8, 78 L.Ed. 212. See, also, W. F. Young, Inc., v. Commissioner, supra, where the language of the court at page 166 of 120 F.2d is peculiarly apposite. In no permissible view could the petitioner's advances to Ferry and to the Navigation Company be deemed to be either losses not otherwise compensated for or necessary and ordinary business expenses.

The decision of the Board of Tax Appeals is affirmed.