The **UNITED GAS IMPROVEMENT COMPANY**, Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 11957.

United States Court of Appeals Third Circuit.

Argued Oct. 19, 1956.

Decided Dec. 31, 1956.

Brady O. Bryson, Philadelphia, Pa., Morgan, Lewis & Bockius, Philadelphia, Pa. (Alfred J. McDowell, Thomas V. Lefevre, Philadelphia, Pa., on the brief), for petitioner.

S. Dee Hanson, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before MARIS, GOODRICH and McLAUGHLIN, Circuit Judges.

MARIS, Circuit Judge.

This case poses the question whether sums advanced by the taxpayer to a controlled subsidiary corporation over a period of years pursuant to the taxpayer's assumption of another's guarantee of the subsidiary's preferred stock dividends were to be regarded as further payments on the purchase price of the common stock of the subsidiary which the taxpayer had previously acquired. The same question is raised with respect to an additional payment made by the taxpayer for a release from future liability on the guarantee. The Tax Court held that these payments were all to be so regarded and that, as worthless stock

losses, they were deductible for income tax purposes only from capital gains and not from gross income, as would have been possible had they been ordinary losses or bad debts. 25 T.C. 229. The taxpayer has brought the case here for review. We are satisfied that the facts of the case, all of which were stipulated, do not support the decision of the Tax Court.

The guarantee of dividends which is the basis of the controversy was originally given by The Koppers Company to the preferred stockholders of The Connecticut Gas & Coke Securities Company in 1926 upon the organization of that company. It appears that Koppers, a holding company, desired to enter the business of producing and selling gas and coke in Connecticut through subsidiaries and hoped to secure New Haven Gas Light Company as a customer for the gas. Koppers accordingly organized another holding company, the Securities Company, to acquire control of New Haven Gas Light Company, in which it already owned some common stock, and also to hold the stock of other public utilities operating in Connecticut. This was done pursuant to an offer, revised September 1, 1926, to New Haven Gas Light Company and its stockholders providing (a) that Koppers was to organize the Securities Company with 200,000 shares of $3 cumulative preferred stock and 300,000 shares of common stock, the preferred stock to have no voting power unless four quarterly dividends were in arrears in which event it should have sole voting power until the default was cured, (b) that Koppers was to receive 200,000 shares of common stock of the Securities Company "in exchange for 20,000 shares of the stock of the New Haven Gas Light Company and 14,000 shares of the stock of the Hartford City Gas Light Company," owned by it, (c) that the Securities Company was to issue all its preferred stock and the remainder of its common stock to the public holders of stock of New Haven Gas Light Company in exchange for their stock, (d) that Koppers was to incorporate a company,

Connecticut Coke Company, to erect and operate a by-product coke and gas plant at New Haven, (e) that Koppers agreed to guarantee the dividends on the preferred stock of the Securities Company for 25 years with the right to substitute the coke company as guarantor, and (f) that Koppers offered to purchase at $25 per share any or all of the common stock of the Securities Company which was acquired by the public in exchange for New Haven Gas Light Company stock, the offer to continue for 90 days after the first delivery of gas by the coke company to New Haven Gas Light Company. The offer was accepted as of October 1, 1926, the exchanges of stock were made and Koppers' guarantee was endorsed on the certificates of preferred stock issued by the Securities Company.[1] The coke company was never substituted as guarantor.

The taxpayer, a holding company, did not come into the picture until 1927. At that time it had various subsidiaries, one of them being The Connecticut Light and Power Company, which were engaged in the manufacture, transmission and distribution of gas in Connecticut. Koppers, as we have seen, was also in this field and the two corporations, desiring to cooperate, entered into an agreement on July 11, 1927, under which the taxpayer agreed to purchase from Koppers the common and preferred stock of the Securities Company and the stock of Hartford City Gas Light Company owned by Koppers "in exchange for 38,-461 shares of the capital stock" of the taxpayer. The agreement also provided that the Light and Power Company should "indemnify and save Koppers harmless on account of its * * * guarantee of dividends" on the Securities Company preferred stock. The agreement further provided that the taxpayer or the Light and Power Company would assume Koppers' existing obligation to purchase the common stock of the Securities Company at $25 per share, and that a series of contracts should be executed providing for the manufacture of gas by the coke company subsidiary of Koppers and the distribution and sale of the gas by the Light and Power Company, the taxpayer's subsidiary, and its affiliates.

Pausing at this point in our chronological statement of events we note that the consideration for the acquisition by the taxpayer of the stock of the Securities Company was expressly stated to be the issuance of its own stock to Koppers and that the taxpayer did not at this time assume the dividend guarantee. On the contrary, it was expressly agreed

---

1. The guarantee read as follows:

"For good and valuable considerations, the receipt of which is hereby acknowledged, The Koppers Company, a corporation organized under the laws of the State of Delaware and having its principal place of business at Pittsburgh, in the State of Pennsylvania, hereby guarantees to the holder or holders of this certificate and every future holder of the shares represented by this certificate, the payment of dividends as in this certificate provided for the period of twenty-five years from the first day of October, 1926, unless prior thereto the said Koppers Company shall have caused to be substituted for this guaranty a guaranty of a corporation to be organized under the laws of the State of Connecticut and duly authorized to erect and operate a by-product coke oven plant in or near New Haven, Connecticut, to supply gas to the New Haven Gas Light Company and for other purposes; and the guaranty of said coke oven company shall continue during such time and times as said coke oven company shall furnish gas to the New Haven Gas Light Company. * * *

"The guaranty of The Koppers Company hereinbefore provided shall terminate when said coke oven company shall have notified in writing the holder or holders of record of the shares of stock represented by this certificate, and shall also have given public notice in a newspaper published in New Haven, Connecticut, that it is ready and willing to execute the guaranty herein provided in favor of said holder or holders of said shares during the term aforesaid either upon such certificates as may from time to time be presented for the purpose or by separate instruments, as may be hereafter determined."

that the guarantee should be assumed by the Light and Power Company, the company which was the major participant in this cooperative arrangement with Koppers.

Between 1927 and 1935 the Securities Company earned and paid its full preferred stock dividends and the Light and Power Company was not called upon to make any payments on the Koppers guarantee which it had assumed. During this period Koppers went through various corporate changes which are not here material. On January 11, 1935 Koppers and the taxpayer entered into another agreement under which the taxpayer itself agreed "to indemnify and hold Koppers harmless on account of its * * * guarantee of dividends" on the Securities Company preferred stock, and the Light and Power Company was released from its obligation under the agreement of July 11, 1927 to do so. However, no change was made in respect to the guarantee itself and Koppers remained liable to the preferred stockholders of the Securities Company thereon. Beginning in

the year 1936 and in every subsequent year until its dissolution under the mandate of the Public Utilities Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., the Securities Company failed to earn its full preferred stock dividends. The taxpayer, pursuant to its assumption in 1935 of Koppers' guarantee of those dividends, advanced to the Securities Company from March 9, 1936 through September 30, 1947 the additional funds needed to pay the full dividends, amounting in all to $1,376,233.66. These advances were made under letter agreements between the taxpayer and the Securities Company whereby the latter agreed to repay the advances when and if it had earnings in excess of preferred dividends then due, other than the arrearages which had been paid by the taxpayer's advances.[2] No return of any part of these advances was ever made by the Securities Company to the taxpayer. The taxpayer treated these amounts as yearly expense items and during the early years attempted to deduct them for federal income tax purposes as expenses,

2. The following is a typical letter agreement:

"June 8, 1938.
"The Connecticut Gas & Coke
 Securities Company,
 New Haven,
 Connecticut.
"Gentlemen:
"We are advised that you have today declared a dividend of 58¢ per share on your preferred stock for the quarter ending June 30, 1938, payable July 1, 1938 to stockholders of record June 15, 1938.

"In order that you may be in a position to pay an aggregate of 75¢ per share with respect to your preferred stock for the quarter ending June 30, 1938, we will advance to you prior to July 1, 1938, the sum of $33,829.49, being equal to 17¢ per share on said preferred stock, to be used by you for that purpose, such advance being made by reason of the indemnification agreement of The United Gas Improvement Company with The Koppers Company of Delaware, in respect to that company's guarantee of dividends of your company.

"This advance to be made upon the following understanding;
"(a) That you will have imprinted upon

your dividend checks a legend in form substantially as follows:

"'In payment of quarterly dividend of 58¢ per share declared by the Company and payable this date, and 17¢ per share advance by The United Gas Improvement Company under its indemnification agreement with The Koppers Company of Delaware in respect to that company's guarantee of dividends.'

"(b) If, in the future, your Company is in a position to pay the accumulated unpaid dividends, or any portion thereof, on its preferred stock, such dividends shall be paid to The United Gas Improvement Company on account of the above advance.

"Please note your acceptance of the above upon the attached copy of this letter and return the same to us.
 "Very truly yours,
 The United Gas Improvement
 Company,
 By F. J. Rutledge
 Vice President
"Accepted June 8, 1938.
 The Connecticut Gas & Coke
 Securities Company,
 By Wm. W. Bodine
 Vice President."

which the Commissioner denied. Thereafter the taxpayer treated the amounts as unallowable deductions for income tax purposes but continued to deduct them from income annually as expenses for the purposes of its own accounts. The Securities Company did not set up these payments as liabilities on its books but showed the amounts on its balance sheet as a contingent liability.

Under the Public Utility Holding Company Act of 1935 the taxpayer was required to divest itself of its interest, through the Securities Company, in New Haven Gas Light Company. This it did by a plan, filed May 6, 1947, approved by the Securities and Exchange Commission on December 9, 1947, and enforced by the United States District Court for the District of Connecticut on January 19, 1948, under which the Securities Company was to be liquidated and its assets were to be distributed to its preferred stockholders, whose claims in liquidation were determined to exceed the total value of the company's net assets. The plan accordingly treated the common stock of the Securities Company as worthless. Finally, the plan provided for the release of Koppers as the guarantor of the dividends on the preferred stock of the Securities Company from and after October 1, 1947, and of the taxpayer's liability under the agreement of January 11, 1935 as indemnitor on the guarantee. The release was made in consideration of the transfer to the Securities Company for distribution to its preferred stockholders of the taxpayer's stock in New Haven Gas Light Company and Hartford City Gas Light Company, the payment of cash needed for liquidation expenses and the release of the taxpayer's claims against the Securities Company for certain loans and for the sums advanced to pay unearned preferred stock dividends. The plan was carried out and the Securities Company was liquidated and dissolved. The cash and securities transferred to the Securities Company by the taxpayer under the plan and the cancelled debt of the Securities Company for loans other than the advances for the payment of unearned dividends, had an aggregate market value of $621,408.88 on December 9, 1947 when the Commissioner approved the plan and of $605,147.38 on January 19, 1948 when the District Court enforced the plan. The transfers were made in 1948 and their value was taken as a deduction by the taxpayer in its 1948 consolidated income tax return. The Commissioner disallowed the claimed deductions and determined deficiencies against the taxpayer for the years 1947 and 1948. The taxpayer sought a redetermination of its tax liability in the Tax Court claiming the right to deduct in 1947 the total amount of $1,376,233.66 which it had advanced to the Securities Company and the amount of $621,408.88, the value on December 9, 1947 of the securities and cash ordered by the Securities and Exchange Commission to be paid over to the Securities Company. In the alternative, the taxpayer claimed that either or both of these deductions accrued on January 19, 1948, when the district court ordered the plan of liquidation of the Securities Company carried out, in which event the amount of the latter deduction would be reduced to $605,147.38, the value on that date of the securities and cash turned over. The Tax Court held that both these amounts were to be regarded as additional payments on the purchase price of the common stock of Securities Company acquired by the taxpayer. As such the court held them to be a part of the loss which the taxpayer suffered when the stock became worthless upon the liquidation of the Securities Company, a loss which under Section 117(d) (1) of the Internal Revenue Code of 1939, 26 U.S. C., could be deducted only from capital gains of which the taxpayer seems to have had none in those years.

The Commissioner urges here, as he successfully did in the Tax Court, that the payments made by the taxpayer to the Securities Company for disbursement to the preferred stockholders under the Koppers guarantee of dividends must be considered as additional investments in the stock of the Securities Company de-

ductible only as worthless stock losses and not as business expenditures. His contention is that the Koppers Company initially gave its guarantee of payment of the dividends on the Securities Company's preferred stock as a means of acquiring the common stock of the Securities Company, and that the taxpayer, having taken over and assumed that guarantee, thereafter stood in the shoes of Koppers to the extent that any and all payments made by the taxpayer under the guarantee obligation which it had assumed were to be regarded as part of its purchase price of the common stock of the Securities Company. In support of this proposition he relies on Section 29.-24–2 of Treasury Regulations 111, which in pertinent part provides:

> "*Capital Expenditures.*—Amounts paid for increasing the capital value or for making good the depreciation (for which a deduction has been made) of property are not deductible from gross income. * * * A holding company which guarantees dividends at a specified rate on the stock of a subsidiary corporation for the purpose of securing new capital for the subsidiary and increasing the value of its stock holdings in the subsidiary may not deduct amounts paid in carrying out this guaranty in computing its net income, but such payments may be added to the cost of its stock in the subsidiary."

The commissioner also relies on Newark Milk & Cream Co. v. Commissioner of Internal Revenue, 3 Cir., 1929, 34 F.2d 854, and Atlantic Coast Line R. Co. v. Commissioner of Internal Revenue, 4 Cir., 1936, 81 F.2d 309.

The difficulty with the Commissioner's position is that the facts of this case do not bring it within the regulation or the cases upon which he relies. For even if the regulation was applicable to the guarantee as originally given by Koppers in 1926 when it organized the Securities

Company and acquired the stock, which the taxpayer does not concede,[3] it does not follow that the later assumption of the guarantee by the taxpayer long after it acquired the stock from Koppers was necessarily for the same consideration as actuated Koppers in giving it originally. While the taxpayer did stand in Koppers' shoes after 1935 in the sense that it took over the burden of Koppers' obligation under the guarantee, its obligations and rights were its own acquired under circumstances and upon considerations quite different from those involved in the original guarantee of 1926.

The stipulated facts show that the taxpayer did not assume Koppers' guarantee of the dividends on the preferred stock of the Securities Company until more than seven years after it had acquired the common stock of Securities Company from Koppers. When the taxpayer did assume the guarantee in 1935 there is nothing whatever to indicate either that it did so for the purpose of securing new capital for the Securities Company or for the purpose of increasing the value of its stock holdings in that company or that its assumption of the guarantee had such effect. The regulation is, therefore, not applicable to this case. Nor are the cases upon which the Commissioner relies helpful to him here. For they merely decided that payments under a guarantee agreement are not to be regarded as expenses properly deductible from income in the years in which they were made. How the payments were ultimately to be treated it was not necessary in those cases to decide.

The Commissioner seeks to avoid this conclusion by asserting that the taxpayer and the Power and Light Company should be treated as a single entity so that the latter's obligation with respect to the guarantee may be regarded as that of the former. This, under the facts of the present case, he may not do. For

---

**3.** As to this point compare with the present case the decision of the Tax Court in Standard Oil Co. of New Jersey v. Commissioner of Internal Revenue, 1946, **7** T.C. 1310, modified 1948, 11 T.C. 843, acquiesced in, 1949–2 Cum.Bull. 3.

the two were separate corporations and, while the taxpayer controlled the Power and Light Company through ownership of a majority of its voting stock, there is nothing in the record to support the theory that the subsidiary corporation did not actually assume the obligation of the dividend guarantee for considerations satisfactory to it. The general rule is that a corporation and its stockholders are deemed separate entities for tax purposes[4] and there is nothing in the facts of this case to take it out of the rule.

■ Another series of facts which are highly pertinent in demonstrating the unsoundness of the commissioner's position are the actions of the taxpayer and the Securities Company at the time of each advancement. For these actions negate the conclusion that these payments were part of the purchase price for the Securities Company stock. The Commissioner has completely ignored the conditions under which the advances were made and their effect on the question whether the advances were part of the purchase price of the stock. While it is true as we have said that the taxpayer stood in the shoes of Koppers, in the sense that the taxpayer in 1935 became liable to indemnify Koppers in the event that company was called upon to make good its guarantee, the record shows that the advances made by the taxpayer to the Securities Company under the guarantee were actually intended to be loans, not advances of capital. For in the case of each advance, a letter agreement was entered into under which the taxpayer was to be repaid the advance if and when the Securities Company realized earnings in excess of its current preferred stock dividend requirements. The possibility of such reimbursement, which existed as long as the Securities Company remained a going concern, was cut off by its liquidation under the mandate of the Public Utility Holding Company Act of 1935. We agree with the Court of Appeals for the Fourth Circuit in its statement in Island Petroleum Co. v. Commissioner of Internal Revenue, 1932, 57 F.2d 992, 994, that "A loan is no less a loan because its repayment is made contingent; and a taxpayer has no right to treat it as a loss until the contingency has occurred or its worthlessness has been otherwise determined."[5]

■ It is well settled that whether and to what extent deductions shall be allowed depends upon legislative grace and only if there is a clear authorization therefor can any particular deduction be allowed.[6] The Commissioner contends that these obligations to repay were merely contingent on the part of the Securities Company, since repayment was to be out of net earnings available after the required preferred stock dividends had been set apart for payment to the preferred shareholders, and hence these contingent loans, under income tax law, did not give rise to a bad debt deduction. It is true that it has been held that a loan repayable only contingently is not a debt, within the meaning of the Internal Revenue Code, for which a bad debt deduction may be taken.[7] Whether this doctrine is applicable to the present case may be questionable, however, in the light of the recent decision of the Supreme

4. New Colonial Ice Co. v. Helvering, 1934, 292 U.S. 435, 442, 54 S.Ct. 788, 78 L. Ed. 1348; Interstate Transit Lines v. Commissioner, 1943, 319 U.S. 590, 63 S. Ct. 1279, 87 L.Ed. 1607.

5. See also Glendinning, McLeish & Co. v. Commissioner of Internal Revenue, 2 Cir., 1932, 61 F.2d 950, 952; Hamlen v. Welsh, 1 Cir., 1940, 116 F.2d 413, 418–419; Old Colony Trust Associates v. Hassett, 1 Cir., 1945, 150 F.2d 179, 183; Addressograph-Multigraph Corp. v. Commissioner, 1945, 4 TCM 147, 176–177; Standard Oil Co. of New Jersey v. Commissioner of Internal Revenue, 1946, 7 T.C. 1310, modified 1948, 11 T.C. 843, acquiesced in, 1949–2 Cum.Bull. 3.

6. New Colonial Ice Co. v. Helvering, 1934, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348.

7. Bercaw v. Commissioner of Internal Revenue, 4 Cir., 1948, 165 F.2d 521, 525; Clark v. Commissioner of Internal Revenue, 2 Cir., 1953, 205 F.2d 353.

Court in Putnam v. Commissioner, 1956, 77 S.Ct. 175. That case involved the payment by an individual of an obligation, which he had guaranteed, of a corporation which at the time of payment had ceased doing business and had previously distributed all of its assets in liquidation. The court held that under the doctrine of subrogation the payment by the guarantor shifted the original debt from the corporation's creditor to the guarantor and that since the debtor corporation was without assets at the time of payment it resulted in an immediate loss from the worthlessness of a debt. Since the debt was a nonbusiness debt and the taxpayer was not a corporation the loss was held under section 23(k) (4) of the Internal Revenue Code of 1939 to be deductible only as a short term capital loss.

The difference between a debt which is worthless because no funds whatever are available at any time to pay it and a debt which is worthless because the specific fund which has been stipulated for its payment has never actually become available may well involve no legal distinction for tax purposes. If so the Putnam case would be authority for holding that the payments by the taxpayer here created debts due it by the Securities Company. If these payments may be regarded as having given rise to debts within the meaning of section 23 (k) of the Internal Revenue Code of 1939 they would be deductible by this corporate taxpayer as bad debts under section 23(k) of the Internal Revenue Code of 1939. For the limiting provisions of section 23(k) (4) which were enforced in the Putnam case do not apply to a corporation. But we do not need to decide whether these payments may be treated as bad debts. For if they did not give rise to debts they undoubtedly resulted in losses to the taxpayer not compensated for by insurance or otherwise and as

such were deductible under section 23 (f) of the Internal Revenue Code of 1939 in the year or years in which the losses were sustained.[8] This necessarily follows since, as we have demonstrated, the facts negative a finding that they constituted additional investments in the common stock of the Securities Company which would represent losses resulting from the worthlessness of that stock.

 The question remains as to the years in which the deductions are properly allowable. With respect to the payments of $1,376,233.66 actually made by the taxpayer for the payment of dividends under the guarantee it is clear that the proper year is 1947. For in that year it was finally determined that the amount would never be repaid since the assets of the Securities Company, the liquidation of which was ordered in that year, were found by the Securities and Exchange Commission not to be sufficient to pay off the existing claims of the preferred stockholders in full. So far as concerns the payment made in 1948, however, we think that it is properly deductible from 1948 gross income. For it was not actually paid until that year but when paid it at once became a loss since the taxpayer could never recover anything in reimbursement.[9]

The decision of the Tax Court will be reversed and the cause remanded for redetermination of the taxpayer's income tax liability for the years 1947 and 1948 in a manner not inconsistent with this opinion.

McLAUGHLIN, Circuit Judge (dissenting).

As I see it the rather elaborate corporate maneuverings so stressed by the majority opinion fail utterly to disguise the fact that petitioner's predecessor, as part of the purchase price of Securities common stock, guaranteed the preferred

8. See M. A. Burns Mfg. Co. v. Commissioner of Internal Revenue, 9 Cir., 1932, 59 F.2d 504, 506; Standard Oil Company of New Jersey v. Commissioner of Internal Revenue, 1946, 7 T.C. 1310, modified 1948, 11 T.C. 843, acquiesced in, 1949–2 Cum.Bull. 3.

9. Compare Camp Manufacturing Co. v. Commissioner of Internal Revenue, 1944, 3 T.C. 467.

stock dividends of that company. The losses so incurred were therefore deductible only from capital gains and not as business expenses, losses or bad debts. That is the well-settled rule.[1]

The first major step in this matter took place when Koppers made alternative offers to the holders of common stock in New Haven: to buy outright a minimum of 100,000 shares at $61.00 per share or the deal that was ultimately consummated. Under the latter the New Haven shareholders exchanged each of their shares for one share of Securities preferred with Koppers guaranty of its $3.00 dividend and ½ share of Securities common which Koppers agreed to purchase for ninety days at $25.00 per share. That was the consideration to the transferors of the shares over which Koppers desired control. Koppers gave certain shares in other Connecticut utilities and the above consideration to the New Haven shareholders in exchange for ⅔ of Securities common. There were only two parties of substance involved. Securities had nothing to give but paper. Plainly, the dividend guaranty was part of the cost of what Koppers received—the controlling shares of Securities.

Koppers then exchanged its share of the deal—⅔ of Securities common—for a common stock interest in petitioner and indemnification for its liability under the dividend guaranty and its obligation to purchase Securities common at $25.00. Petitioner agreed to have Koppers saved harmless by causing, through its majority stock interest, one of its subsidiaries, Connecticut Light, to agree to indemnify Koppers for its guaranty on the Securities preferred. The majority gives this last circumstance talismanic significance. In this record there is no proof that Connecticut Light ever executed an indemnity agreement. Petitioner did not allege such execution in the pleadings and it was not so stipulated in the Tax Court.[2] Nor is there anything to show petitioner was an authorized agent for Connecticut Light in this transaction. Actually the record reveals nothing tangible by way of consideration to Connecticut Light for undertaking the indemnity obligation. The court opinion goes no further than to suggest that the quid pro quo was "considerations satisfactory to it" (Connecticut Light).[3] The Commissioner is ordered to accept whatever this nebulous phrase represents as Con-

1. Where a shareholder pays additional amounts arising out of his stockholdings, the payments are capital losses. Arrowsmith v. Commissioner, 1952, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6; Commissioner of Internal Revenue v. Switlik, 3 Cir., 1950, 184 F.2d 299; Commissioner of Internal Revenue v. Adam, Meldrum & Anderson Co., 2 Cir., 1954, 215 F.2d 163; Interstate Transit Lines v. Commissioner, 8 Cir., 1942, 130 F.2d 136, affirmed, 1943, 319 U.S. 590, 63 S.Ct. 1279, 87 L. Ed. 1607.

2. The stipulation states:

"12. Under the said agreement of July 11, 1927, as more fully set forth therein, petitioner and Koppers also agreed, inter alia, that The Connecticut Light and Power Company, then a subsidiary of petitioner, of which petitioner owned a majority of the voting stock, should indemnify and save Koppers harmless on Koppers' above recited guaranty of dividends on the preferred stock of Securities Company.

"13. No payments were made by The Connecticut Light and Power Compa-

ny pursuant to the above indemnification agreement."

3. Petitioner characterizes the consideration to Connecticut Light on brief as follows:

"Connecticut Light had a very substantial stake in this agreement of July 11, 1927, to which it was, through the agency of its parent (petitioner), in effect a principal party. The various provisions therein for its benefit, its contemplated participation in the joint plan for the manufacture and sale of gas in Connecticut, and the protection and development of its market represented ample consideration for its assumption of the burden of Koppers' guarantee of the preferred stock dividends of Securities Company."

elsewhere:

"These new arrangements can be seen in the agreement of July 11, 1927, which petitioner clearly negotiated with Koppers in part for itself and in part for Connecticut Light. This agreement called for a long-term and elaborate business relationship between Connecticut

necticut Light's recompense for undertaking, if it did, a multi-million dollar guaranty, and further scrutiny is eliminated as violative of the rule that the parent and subsidiary are separate taxable entities. It would seem at least a bit doubtful that the Connecticut public utility regulatory body would allow Connecticut Light, an operating utility company of that state, to waste its assets on or to include in its cost of operations or rate base, this strange obligation with illusory consideration to it but with substantial present enrichment to its holding company parent. The minority shareholders of Connecticut Light could have surely attacked this overreaching by the parent. There is no good reason why the Commissioner cannot. Furthermore, the first time any payment was called for under the guaranty, petitioner relieved Connecticut Light, if it was ever bound, and assumed the indemnity obligation directly. So without proof of execution, consideration or performance a multi-million dollar contract emerges on review. It is not claimed that there was consideration to petitioner for taking over directly the indemnity in 1935. But petitioner would have lost control of Securities to the preferred stockholders, if the guaranteed dividend had not been paid by someone. In the face of this factual situation it is not easy to accept the pronouncement that these payments were not part of the cost of obtaining and keeping the ⅔ common stock interest in Securities.

The regulation (Section 29.24–2) quoted in the majority opinion covers this precise kind of circumstance. Petitioner undertook the same transaction as Koppers. Koppers assumed the guaranty "for the purpose of securing new capital for the subsidiary" (Securities)— namely, the New Haven common stock. The fact that the plan originated with Koppers and was transferred in toto to petitioner some months later does not change its inherent substance. Both of the reasons for the payments by petitioner when made arose directly out of the acquisition of the Securities common, namely, to indemnify Koppers in accordance with the right of indemnification given with other consideration to Koppers in exchange for the Securities common and "for the purpose of * * * increasing the value of its stockholdings in the subsidiary" (Securities) as petitioner would have lost control of Securities if the dividends were not paid.

The letter agreements to reimburse petitioner if and when earnings above the preferred stock dividends became available to Securities do not take those payments out of the regulation because by general law the guarantor would be subrogated to the rights of the subsidiary preferred stockholders to the extent of the amounts paid under the guaranty in every case.[4] The claimed distinction would render the regulation completely ineffective. It cannot be too strongly urged that the regulation does not merely say payments under the kind of guaranty before us are not deductible in the years paid. And it does not say the said payments are not deductible unless the subsidiary gives a letter agreement to the parent. But it does flatly state that payments under the stipulated circumstances are not deductible at all but are capital expenditures to be added to the cost of the stock in the subsidiary. This regulation has been in effect in practically identical form since the enactment of the Revenue Act of 1918.[5] The court's con-

---

Light and the Koppers group, contemplating the purchase of gas by Connecticut Light from the latter and the resale thereof to utility companies operating in a half-dozen or more areas in the state of Connecticut."

**4.** Standard Oil Co. of New Jersey v. Commissioner, 1946, 7 T.C. 1310, modified, 1948, 11 T.C. 843. acq. 1949–2 C.B. 3.

**5.** See Article 582 of the Treasury Regulations 45 (1920 and 1921 eds.), and Treasury Regulations 62, 65 and 69, promulgated under the Revenue Acts of 1921, 1924 and 1926, respectively; Article 282 of Treasury Regulations 74 and 77, promulgated under the Revenue Acts of 1928 and 1932, respectively; Article 24–2 of Treasury Regulations 86, 94 and 101, promulgated under the Revenue Acts of

**322**

clusion cannot be logically reached without invalidating it.

Standard Oil Co. of New Jersey v. Commissioner, 1946, 7 T.C. 1310, modified, 1948, 11 T.C. 843. acq. 1949–2 C.B. 3, characterized as an "exact parallel" and a "twin" of this issue by petitioner and obliquely relied on by the majority had to do with a radically different state of affairs. The regulation under Section 24 could have had no application there because Standard was not a stockholder of Export when the disputed payments were made.[6] Standard prior thereto had never been a parent of Export, but simply a minority stockholder. In that litigation the Tax Court found that the guaranty of the preferred stock in Export was undertaken jointly and severally with the other Export common stockholders, as an ordinary and necessary expense or loss for the purpose of retaining Anglo as a customer for the petroleum products of the Export common stockholders.

Even mistakenly applying the holding of the Standard decision, supra, to our problem, petitioner's deduction would be limited to the amount paid during the suit years, in accordance with the Standard formula.[7] As is seen in the quoted language from that opinion the court summarily declined to accept the amazing proposition that the guaranty payments, though found as a fact to be ordinary expenses or losses, could be held in suspended animation and allowed as a deduction in the year of the windup of the primary obligor. Petitioner did not carry those payments forward as receivables on its books; neither did Standard Oil Co. of New Jersey; nor could this be accomplished by reasonably accurate accountancy practice since it would obliterate the cardinal rule of accounting and taxation of an annual accounting of gains and losses. The current notion of a deduction in 1947 or 1948 for the $1,376,233.66 paid in previous years, apparently did not occur to the tax experts who prepared petitioner's returns. It was first raised years later in 1952 after the dispute regarding the $605,147.38 was in progress. If those payments were ever ordinary deductions, they were allowable only in the year paid.

In any event, concludes the majority opinion, the deductions claimed were "* * * losses * * * not compensated for by insurance or otherwise". So labeling the payments does not automatically remove them from the capital losses category. Not all payments by a corporation are losses and not all losses are deductible in full under Section 23 (f).[8] The tax treatment of a payment

1934, 1936 and 1938, respectively; Section 19.24–2 of Treasury Regulations 103 promulgated under the Internal Revenue Code of 1939; Section 29.24–2 of Treasury Regulations 111, promulgated under the Internal Revenue Code of 1939 (applicable to taxable years beginning after December 31, 1941), here involved; and Section 39.24(a)–2 of Treasury Regulations 118, also promulgated under the 1939 Code but applicable to taxable years beginning after December 31, 1951.

6. At 7 T.C. 1320, the Tax Court states: "Petitioner, although no longer a stockholder of Export, still remained liable under its guaranty contract dated November 6, 1929. During the period from January 1, 1930, to June 30, 1936, inclusive, the preferred stockholders of Export were paid dividends of $24,860,118.30. Of this amount $21,271,525.37 was paid by the guarantors, and of the amount paid by the guarantors petitioner

paid 40 per cent or $8,508,610.15. Only $764,914.24 of the amount paid by petitioner is involved in this proceeding. The years in which such other amounts were paid are now closed. The amount of $764,914.24 represents 40 per cent of the final dividend of $1,912,285.60 paid on the preferred stock of Export for the first 6 months of 1936. The amount was paid by petitioner on June 30, 1936, after it had ceased on May 19, 1936, to be a stockholder of Export."

7. See quotation from the Standard Oil opinion in note 5, supra.

8. Income Tax Regulations 111, Section 29.23(f)–1: "Losses sustained by domestic corporations during the taxable year and not compensated for by insurance or otherwise are deductible in *so far as not prohibited or limited by sections 23(g), 23(h), 24(b), 112, 117, 118, and 251.*" (Emphasis supplied.)

depends on purpose for which it is made. In Interstate Transit Lines v. Commissioner, 8 Cir., 1942, 130 F.2d 136, affirmed 1943, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607, the Supreme Court faced a quite analogous situation. In that case, the parent corporation had paid the operating deficits of its subsidiary pursuant to a contract by which the parent was to be liable for all such deficits and sought a deduction for the payments. The Court specifically held that the payments could not be deducted by the parent and impliedly that they should be capitalized as part of the cost of the stock in the subsidiary.

The Supreme Court has just now stressed that payments under a guaranty contract are not changed to ordinary losses by that circumstance. Putnam v. Commissioner, 77 S.Ct. 175, 178. With reference to the right of subrogation under such conditions, which in the instant problem was memorialized by the letter agreements the Court, in Putnam stated:

> "Under the doctrine of subrogation, payment by the guarantor, as we have seen, is treated not as creating a new debt and extinguishing the original debt, but as preserving the original debt and merely substituting the guarantor for the creditor."

Here petitioner was subrogated to the rights of the Securities preferred stockholders. The latters' rights to dividends were not debt obligations of Securities and the guarantors' rights cannot rise above the rights of the parties for whose benefit the guaranty was made. It follows that the result of the majority cannot be rationalized as a business bad debt deduction.

Though I am satisfied the payments were part of the cost of the Securities common as the Tax Court held, should the finding of this court that the guaranty obligation was not assumed by petitioner until 1935 be accepted as divorcing the assumption of guaranty from the Securities common, petitioner would be no better off. It is agreed that there was no consideration to petitioner in 1935, therefore under that sort of reasoning it must have been a voluntary assumption of guaranty, a gratuity or the like. In those circumstances the payments could not be deductible under Reading Co. v. Commissioner, 3 Cir., 1942, 132 F.2d 306; W. F. Young, Inc., v. Commissioner, 1 Cir., 1941, 120 F.2d 159; American Cigar Co. v. Commissioner, 2 Cir., 1933, 66 F.2d 425, all cited with approval in Putnam, supra, at footnote 13.

The immediate result of ignoring both the principle that deductions are matters of legislative grace and the long standing regulation is an enormous windfall to petitioner. Far more serious than that, a new course is charted for tax avoidance. Instead of the usual purchase of and payment for stock with the buyer limited to capital loss deduction if the stock deteriorates in value, the corporate taxpayer can give the vendor preferred stock in one of its subsidiaries, guaranty the dividends and obtain an ordinary loss deduction on any guaranteed payment if the venture fails. All this despite the fact that in both transactions capital gain results if there is a gain on the investment.

The Tax Court followed the controlling regulation and the pertinent case law. Atlantic Coast Line Railroad Co. v. Commissioner, 31 B.T.A. 730, affirmed 4 Cir., 1936, 81 F.2d 309, certiorari denied, 1936, 298 U.S. 656, 56 S.Ct. 676, 80 L.Ed. 1382. And see our own Newark Milk & Cream Co. v. Commissioner, 3 Cir., 1929, 34 F.2d 854. I think the decision of that court should be affirmed.